SYLLABUS

(This syllabus is not part of the opinion of the Court. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Supreme Court. Please note that, in the interest of brevity, portions of any opinion may not have been summarized).

**State of New Jersey v. Darien Weston (A-61-13) (073032)**

**Argued January 5, 2015 -- Decided June 25, 2015**

**PATTERSON, J., writing for a unanimous Court.**

In this appeal, the Court considers the circumstances under which a jury's viewing of the pretrial, videotaped statements of certain witnesses constitutes plain error.

On July 10, 2007, a Newark police officer found Paul Phillips unresponsive and bleeding from his mouth in a dumpster. Having sustained two gunshot wounds to the head, he was pronounced dead at a local hospital. Police identified three witnesses, Nahaaj Hunter, D.C., and Q.M., who claimed to have witnessed the murder and made statements identifying defendant as the shooter. Q.M. also claimed to have helped defendant dispose of the murder weapon. D.C., who was ten years old at the time of the shooting, told police varying accounts of what he observed.

Defendant was charged with murder, unlawful possession of a weapon, possession of a weapon for an unlawful purpose, carjacking, kidnapping, felony murder, terroristic threats, tampering with physical evidence, hindering apprehension, and aggravated assault. At trial, Q.M. recanted his statement and claimed that he never witnessed the murder, did not help dispose of the gun, and that a police officer had coerced him into lying. D.C. testified unequivocally that he saw defendant order the victim into the dumpster and then shoot him. As a result of Q.M.'s recantation, and the varying accounts D.C. offered in his pretrial statements, the court allowed videotapes of both pretrial statements to be played for the jury in the courtroom.

At the charge conference, the State suggested, without defense objection, that a DVD player be made available for jurors to view the videotaped statements during deliberations. The trial court granted the request and during summation, the prosecutor urged the jury to watch the videotaped statements of both witnesses. Two days into deliberations, defendant moved for a mistrial on the ground that a juror was tainted and stated that he may have been mistaken when he declined to object to the State's proposal to give jurors access to those statements during deliberations. The court did not remove the DVDs from the jury room, suggesting that doing so after two days of deliberations could be prejudicial to both parties. The jury returned a partial verdict, convicting defendant of everything except murder, carjacking, felony murder and aggravated assault.

At defendant's retrial on the remaining counts, Hunter, D.C., and Q.M. testified again. D.C. testified that he witnessed the murder and identified defendant as the shooter, but added new details about an exchange between defendant and Phillips before the murder. Q.M. testified that he never witnessed the murder, did not help dispose of the gun, and that police had coerced him into identifying defendant. The court denied the State's request to allow D.C.'s pretrial statements to be allowed into evidence, but allowed the recording of Q.M.'s pretrial statement to be played for the jury. The State later informed the court that it had arranged for the jury to have access to a DVD player in the jury room. Defendant did not object to that procedure. In summation, the State urged the jury to watch the DVD and to note the inconsistencies between Q.M.'s pretrial statement and his testimony on the stand. The jury convicted defendant of murder, carjacking, and felony murder, but acquitted him of aggravated assault. The court imposed an aggregate term of life plus thirty-five years, with a total period of parole ineligibility of more than eighty-five years.

An appellate panel reversed, holding that both trial courts committed plain error when they permitted the juries unrestricted access to videotaped statements during deliberations. The panel reasoned that the trial courts failed to adhere to the procedures set forth in State v. Michaels, 264 N.J. Super. 579, 643-45 (App. Div. 1993), aff'd on other grounds, 136 N.J. 299 (1994), and applied to pretrial statements by this Court in State v. Burr, 195 N.J. 119, 134 (2008). This Court granted the State's petition for certification. 217 N.J. 287 (2014).

**HELD**: Given the content of the statements, and the strength of the other evidence presented by the State, the trial courts' decisions permitting the juries access to the pretrial statements did not constitute plain error.

1. In Michaels, supra, after deliberations began, the jury asked to view the videotaped testimony of certain victims. The trial court permitted the jury to review the video in court under its supervision. On appeal, the Appellate Division held that it was not error for the testimony to be replayed in open court, but recommended that trial judges confronted with similar requests first offer a readback of the transcript of the testimony. If the jury still asks to see the video, the court should exercise its discretion to balance that need against any possible prejudice. In Burr, supra, this Court applied the guidelines set forth in Michaels. There, during deliberations, the jury requested videotapes

that had been marked as exhibits and admitted into evidence. Over the defendant's objection, the trial court permitted the videotaped statements of a child victim to be replayed for the jury in open court. The Appellate Division reversed defendant's convictions, holding that the trial court abused its discretion by not inquiring into the jury's need for that replay and by not balancing that need against any prejudice to the defendant. This Court agreed that the defendant in Burr was entitled to a new trial and remanded the case to the trial court. On remand, this Court directed the trial court to inquire whether the jury would be satisfied by a readback of the testimony. In the event that the jury persisted in its request for a video replay, the trial court was instructed to take into consideration fairness to the defendant. The court was also charged to ensure that any video playback was accompanied by a readback of direct and cross-examination of the witness necessary to provide context. The trial court would have the discretion to deny the jury request upon a showing that the prejudice to the defendant from the playback could not be ameliorated through other means. Finally, any playback, and accompanying readback, must occur in open court. (pp. 17-20)

2. These cases, and the Court's subsequent jurisprudence, consistently direct that, because a jury's review of a videotaped witness statement or testimony raises concerns that a particular segment will be overemphasized or viewed out of context, any replay of such a statement or testimony must be conducted in open court, under the careful supervision of the trial judge. The cases also instruct that a replay of a videotaped statement during deliberations should only be conducted upon the jury's request, and after a determination that the jury's concerns cannot be addressed with a readback of testimony. (pp. 21-22)

3. The judges who oversaw this defendant's trials addressed most of the issues that arose in the course of the proceedings, but did not follow the procedures set forth in Michaels, Burr, and the Court's later authority. The jury did not request a replay of the videotaped statements in dispute and the courts did not follow the guidelines established to ensure that any jury review of the videotape was conducted in open court. The Court agrees that it was error for the courts to permit the juries to have unsupervised access to the videotaped statements during deliberations. However, defendant did not object, during either trial, to the juries' unsupervised access to the videotapes, which were properly admitted into evidence. Accordingly, the Court reviews whether the jury's access during deliberations to the D.C. and Q.M. videotaped pretrial statements constituted plain error. Plain error is that which is clearly capable of producing an unjust result. The Court undertakes this analysis in light of the unusual setting presented in this case, in which there is no possibility that the jury had access to inadmissible evidence that might improperly affect the outcome of a trial. Instead, this case concerns the properly admitted pretrial statements of two witnesses, both of whom testified before the jury and were cross-examined at trial. To make this determination, the Court considers those statements in the context of the State's evidence as a whole. (pp. 22-26)

4. The jury's access to D.C.'s videotaped statement during deliberations in the first trial did not deprive defendant of a fair trial. Defendant presented the statement to the jury, and his counsel affirmatively relied on it in summation. D.C.'s confusing responses to police interrogation on videotape had the potential to undermine the child's testimony about defendant on the witness stand. D.C. testified at both trials that he personally witnessed the shooting. If jurors in the first trial viewed D.C.'s videotaped statement and relied on it more than they relied on the witness's trial testimony, then that could only have weakened the State's case. The trial court's decision to allow the jury in the first trial to have D.C.'s videotaped statement during deliberations did not constitute plain error. In the case of Q.M., whose videotaped pretrial statement was in the juries' possession in both trials, application of the plain error standard requires a more detailed inquiry. In his pretrial statement, Q.M. incriminated defendant, but prior to the first trial, Q.M. recanted and claimed that his statement had been prompted by police coercion. In both trials, Q.M. disclaimed any knowledge of the murder. To determine whether the juries' access to Q.M.'s pretrial statement during deliberations was clearly capable of producing an unjust result, the Court considers the strength of the other evidence presented by the State, some of which directly corroborated Q.M.'s pretrial statement, and none of which supported his testimony at trial. Q.M.'s attempts to explain away the details contained in his pretrial statement, and to account for other inconsistencies found no support in the other evidence in the trial record. (pp. 27-32)

5. As reflected by defendant's affirmative use of D.C.'s pretrial statement, that statement was substantially less incriminatory than D.C.'s testimony at trial. If the jury decided that Q.M.'s pretrial statement was more credible than his trial testimony recanting his statement, such a determination found robust support in other evidence admitted in both trials. It is virtually inconceivable that either verdict was driven by the jury's unsupervised access to the videotaped version of the properly admitted pretrial statements, rather than by the jury's evaluation of the evidence. In light of the evidence admitted in both of defendant's trials, the jurors' unsupervised access to D.C.'s videotaped pretrial statement during deliberations in the first trial, and to Q.M.'s videotaped pretrial statement during deliberations in both trials, was not clearly capable of producing an unjust result. Neither trial judge committed plain error; in both cases, defendant received a fair trial. (p. 33)

6. Notwithstanding the Court's review of defendant's trials under the plain error standard that governs this case, it reiterates that when videotaped pretrial statements or trial testimony are admitted into evidence, deliberating juries should view them only if they request to do so, and then only in open court under the supervision of the trial judge. (pp. 33-34)

The judgment of the Appellate Division is **REVERSED**. The matter is **REMANDED** to the Appellate Division for its consideration of the remaining issues raised by defendant on appeal from his convictions that were not previously addressed.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.**

STATE OF NEW JERSEY,

    Plaintiff-Appellant,

       v.

DARIEN WESTON,

    Defendant-Respondent.

Argued January 5, 2015 – Decided June 25, 2015

On certification to the Superior Court, Appellate Division.

Brian J. Uzdavinis, Deputy Attorney General, argued the cause for appellant (John J. Hoffman, Acting Attorney General of New Jersey, attorney).

Brian P. Keenan, Assistant Deputy Public Defender, argued the cause for respondent (Joseph E. Krakora, Public Defender, attorney).

JUSTICE PATTERSON delivered the opinion of the Court.

In this appeal, we review the convictions of defendant Darien Weston for first-degree murder and eight other offenses. The charges arose from the 2007 murder of a young Newark resident who was kidnapped, transported to a parking lot, forced into a dumpster, and shot twice at close range. In a 2008 trial, a jury convicted defendant of six offenses, but was unable to reach a verdict on four other charges. In 2009, a

second jury convicted defendant of three of the remaining four charges. During deliberations in both trials, with no objection from defendant prior to the start of deliberations, jurors were permitted unsupervised access to videotaped recordings of witness statements that had been admitted into evidence. The record does not reveal whether either jury viewed the videotaped statements in the jury room.

Following defendant's appeal, an appellate panel held that plain error occurred when the judges who each oversaw one of defendant's trials permitted the jurors access to the videotaped statements in the jury room. The panel stated that it could not conclude that, in either trial, the trial court's error was harmless. It reversed defendant's convictions on all charges and remanded the matter for a new trial.

We reverse the Appellate Division's judgment of reversal. Consistent with our prior jurisprudence, the Appellate Division correctly perceived that, if a jury views a videotaped pretrial statement or videotaped testimony during deliberations, it should do so only in open court under the supervision of the trial judge. We hold, however, that the trial courts' decisions to permit the juries access to the pretrial statements in defendant's trials did not constitute plain error in these trials. Given the content of the two statements and the strength of the other evidence presented by the State, we do not

2

find that the trial courts' handling of the videotaped statements during jury deliberations was "clearly capable of producing an unjust result." R. 2:10-2. Accordingly, we reverse and remand this matter to the Appellate Division for its consideration of the remaining issues raised by defendant in his appeal from his convictions, that the panel did not address.

I.

On the evening of July 10, 2007, Paul Phillips, a twenty-three-year-old employee of a utility company, attended a prayer meeting at the Kingdom Hall of Jehovah's Witnesses in Montclair. He and his girlfriend, Erin King, planned to meet at Phillips's home in Newark after his return from the prayer meeting. Phillips left Montclair at approximately 8:40 p.m., driving his green Dodge Durango sports utility vehicle (SUV). As Phillips departed, he called King to advise her that he was on his way to meet her. In the hours that followed, she repeatedly tried to reach him on his cell phone, but her calls went unanswered.

Just before 10:00 p.m. that evening, Officer Juan Torres of the Newark Police Department was dispatched in response to a 9-1-1 call. The caller stated that there was an injured person in a green dumpster in a parking lot behind a row of homes on Peshine Avenue in Newark. Torres found Phillips in the dumpster, unresponsive and bleeding from his mouth. Paramedics

3

arrived and took Phillips to the hospital, where he was pronounced dead.

An autopsy revealed that Phillips's death was caused by two gunshot wounds to the head, one of which had been fired from a range of less than one to one and a half feet from the victim. Police found blood, matched by DNA analysis to Phillips, inside the dumpster and a .25 mm shell casing nearby. Three days after the shooting, Phillips's vehicle was recovered in Irvington, five miles from the scene.

In the weeks following the murder, three witnesses who said that they were present at the scene of Phillips's murder were located by police. The first of the three was Nahaaj Hunter, a nineteen-year-old man who was playing basketball near the Peshine Avenue parking lot where the shooting occurred. Hunter contacted a tip line, stated that he had witnessed Phillips's murder, and identified defendant as the shooter. He gave a statement to police officers.

Police officers also learned that D.C., a ten-year-old boy who lived near the scene of the shooting, said that he had been present during the shooting. D.C. went to the police station with his mother a month after Phillips's death and gave a statement that was recorded on audiotape and videotape. He identified a photograph of defendant and stated that defendant was the shooter. D.C.'s mother would later testify that, on the

evening of the murder, she heard shots. Her son ran to her, crying and saying that someone had told someone else to get in a dumpster. She also stated that her son identified defendant in a yearbook photograph as the man who shot the victim in the dumpster.

Police also obtained a videotaped statement from a third witness, twelve-year-old Q.M., who spoke to two officers with his mother present. In his statement, recorded on audio and video and later transcribed, Q.M. recounted that he had been acquainted with defendant for about two months before the murder and that he and defendant spent time together daily during that period. Q.M. stated that, on the evening of Phillips's murder, he saw a gray Durango pull up in the back of Peshine Avenue with defendant in the front seat and someone else in the back.

Q.M. told police that as the car arrived, another local resident whom Q.M. knew approached defendant, briefly spoke with him, and nodded affirmatively. Q.M. said that defendant then got out of the car, walked to the back door and opened it, and ordered the man in the back out of the car and into the dumpster. Q.M. said that defendant later told him that "it was a carjacking" and that the victim had his head in his hands in the dumpster and was crying just before he was killed. According to Q.M.'s statement, defendant shot the victim twice

in the head. During his statement, Q.M. was shown a photograph of defendant and identified him as the shooter.

Q.M. also told police about an encounter with defendant about an hour and a half after Phillips's murder. He said that defendant, driving the Durango, pulled up to Q.M. and told Q.M. to get into the car. According to Q.M., defendant threw a black gun on Q.M.'s lap, ordered him to take it and "stash" it, and threatened to kill Q.M.'s mother if he did not comply. Q.M. told police that he took the gun as ordered by defendant and disposed of it, and also took a pair of boxing gloves from the vehicle. With the consent of Q.M.'s mother, police officers searched his home and found the victim's boxing gloves.

As a result of the officers' investigation, defendant, who was seventeen years old at the time of the murder, was arrested. Following a hearing, defendant was waived to adult court pursuant to N.J.S.A. 2A:4A-26.

## II.

A grand jury indicted defendant for first-degree murder, N.J.S.A. 2C:11-3(a)(1) or (2); third-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); first-degree carjacking, N.J.S.A. 2C:15-2(a)(1)-(4); first-degree kidnapping, N.J.S.A. 2C:13-1(b)(1) or (2); first-degree felony murder, N.J.S.A. 2C:11-3(a)(3); third-degree terroristic

6

threats, N.J.S.A. 2C:12-3(a); fourth-degree tampering with physical evidence, N.J.S.A. 2C:28-6(1); two counts of third-degree hindering apprehension, N.J.S.A. 2C:29-3(b)(3); and fourth-degree aggravated assault (pointing a firearm), N.J.S.A. 2C:12-1(b)(4).

Defendant's first trial took place over ten trial days in September 2008. The State presented the testimony of Hunter, D.C., Q.M., and twenty other witnesses.

Hunter testified that at the time of the murder, he had known defendant for about five or six months. He stated that three days before Phillips's murder, he and defendant fought over a woman, and defendant threatened to shoot him in the head with a small handgun. Hunter identified a handgun that had been recovered by police and linked to Phillips's murder by ballistics evidence as the weapon that defendant had used to threaten him during their dispute three days before Phillips's murder.

Hunter testified that he witnessed Phillips's shooting while at a basketball court located approximately two hundred feet from the location where Phillips was killed. He recalled that a black SUV pulled up behind the row of homes on Peshine Avenue, and defendant got out of the driver's seat. According to Hunter, defendant went to the back of the SUV, pulled Phillips from the vehicle, forced him into the dumpster and

7

fired three shots at him from about two feet away. Hunter stated that several children also witnessed the murder, and that the children ran away immediately thereafter. Hunter identified defendant in court as the individual who had killed Phillips. He was extensively cross-examined, particularly with respect to his history of criminal offenses, and admitted that he did not like defendant.

D.C. also testified at defendant's first trial. Notwithstanding inconsistent versions of the Phillips murder given in his videotaped statement to the police, D.C. provided only a single account when he testified at trial. He said that he watched as Phillips attempted to leave in his truck and defendant and other men seized him. D.C. testified that he saw defendant tell the victim to get out of the car and into the dumpster, point a gun at the victim's head, and shoot him. D.C. said that he immediately ran to his mother and told her all that he had seen.

On cross-examination, defense counsel impeached D.C. with his videotaped statement, and D.C. denied making several portions of that statement that conflicted with his testimony at trial. Defendant was permitted to play that statement in its entirety to the jury. The State provided a written transcript to the jurors for their use while the statement was played, but

8

that transcript was not admitted into evidence or made available to the jurors during deliberations.

Before defendant's first trial commenced, Q.M. recanted his pretrial statement. At defendant's first trial, Q.M. insisted that he did not witness Phillips's murder, converse with defendant in the victim's vehicle, or dispose of the gun. Q.M. claimed that in an encounter in the bathroom during a break from his discussions with police officers, one of the officers coerced him into repeating details that the officers provided to him by threatening to arrest his mother if he did not comply. He testified that he regretted getting defendant into trouble.

In the wake of Q.M.'s recantation, the State sought to admit his pretrial statement as substantive evidence. The trial court held a hearing under N.J.R.E. 104 out of the presence of the jury, and admitted Q.M.'s pretrial statement as a prior inconsistent statement pursuant to N.J.R.E. 803(a)(1) and State v. Gross, 121 N.J. 1 (1990). With Q.M. on the witness stand, his pretrial statement was then played for the jury. As it did with respect to D.C.'s statement, the State gave the jury a written transcript of the statement to follow as the videotaped version was played in open court. The transcript was not admitted into evidence and was not provided to the jury for use during deliberations.

At the charge conference, the State suggested, with no objection from defendant, that a DVD player be made available to the jurors so that they could view the videotaped statements. The trial court stated that it had no objection to permitting the jury to review the videotaped statements during deliberations. During her summation, the prosecutor urged the jury to watch the videotaped statements of both witnesses. The trial court instructed the jury, in accordance with Model Jury Charges (Criminal), "Prior Contradictory Statements of Witnesses (Not Defendant)" (rev. May 23, 1994), regarding the special considerations raised by the admission of the pretrial statements of D.C. and Q.M.

After two days of deliberations, defendant moved for a mistrial on the ground that a juror was tainted. After requesting a mistrial, defense counsel stated that although he could not make a principled argument against the admission into evidence of the videotaped statements of D.C. and Q.M., he had concluded he may have been mistaken when he declined to object to the State's proposal to give the jurors access to those statements during deliberations. Defense counsel stated that he would have preferred if the jury had been required to request a statement before being allowed to play it, so in-court testimony could be read back as well. The trial court declined to remove

10

the DVDs from the jury room, suggesting that doing so after two days of deliberations could be prejudicial to both parties.

Shortly after that colloquy, the jury returned a partial verdict. There were no questions from the jury regarding the videotaped statements, and the jury gave no indication that it watched the DVD of those statements during deliberations.

The jury in defendant's first trial convicted him of six offenses: first-degree kidnapping, second-degree possession of a weapon for an unlawful purpose, third-degree possession of a weapon without a permit, third-degree terroristic threats, third-degree hindering apprehension, and fourth-degree tampering with physical evidence. It was unable to reach a verdict with respect to the other counts of defendant's indictment.

Defendant's retrial on those remaining counts, conducted before a different judge, took place over seven trial days during September and October 2009. Among the twenty witnesses who testified were Hunter, D.C. and Q.M.[1]

With the exception of a discrepancy regarding the distance from which he viewed Phillips's murder, Hunter's testimony at defendant's second trial was essentially consistent with his

---

[1] Hunter testified at the second trial only after a material witness warrant was issued. He was housed by police in a hotel for his protection during the trial. He testified that since he had identified defendant as the individual who shot Phillips, he had been labeled a "snitch," shot at, "jumped" three or four times, and threatened.

11

testimony at the first trial. He identified defendant as the individual who shot Phillips.

D.C. again testified that he witnessed Phillips's murder and identified defendant as the shooter, adding new details regarding an exchange between defendant and Phillips immediately preceding the murder. The trial court denied the State's request to move D.C.'s videotaped statement into evidence at the second trial.

Q.M. was also a witness at the second trial. The trial court held a hearing under N.J.R.E. 104 out of the presence of the jury, and admitted Q.M.'s videotaped statement pursuant to Gross, supra, 121 N.J. at 7-17. As he had during the first trial, Q.M. denied that he had witnessed Phillips's shooting, that he had been in the victim's vehicle with defendant, that he had disposed of a handgun on defendant's instructions, and that defendant had threatened to kill Q.M.'s mother. The State then played the DVD of Q.M.'s pretrial statement for the jury and provided the jury with a transcript while the statement was played in open court. That transcript was not admitted into evidence and was not made available to jurors during deliberations. Q.M. again claimed that his videotaped statement incriminating defendant had been obtained by police coercion and denied the truth of the contents of his statement on direct and

12

cross-examination.  Q.M. further testified that he had attempted suicide after hearing voices that told him to kill himself.

As did the judge in the first trial, the trial court decided to permit the jury access to the DVD of Q.M.'s videotaped statement during its deliberations in the second trial.  Subsequently, the State represented to the trial court that it had arranged for the jury to have access to a DVD player in the jury room.  Defendant did not object to that procedure.  In summation, the State urged the jury to watch the DVD and to note the inconsistencies between Q.M.'s pretrial statement and his testimony on the stand.

During deliberations, the jurors did not ask questions concerning the DVD.  Like the jury in defendant's first trial, the jury in his second trial gave no indication that it viewed the DVD of Q.M.'s statement in the jury room.[2]

In defendant's second trial, the jury convicted him of first-degree murder, first-degree carjacking, and first-degree felony murder, and acquitted him of fourth-degree aggravated assault.  After hearing victim-impact statements from Phillips's

_____

[2] The jurors in the second trial sent the court a single note during the first afternoon of deliberations:  "[c]an we end now and come back tomorrow.  Some of us want to think alone.  P.S. How did [Q.M.] come into play[?]"  The trial court permitted them to adjourn for the day, and, in response to the jurors' inquiry about Q.M., the court instructed them to "rely on your own recollection of the evidence for the answer to that question."

13

family members and friends pursuant to the Crime Victim's Bill of Rights, N.J.S.A. 52:4B-34 to -38, and making findings as to aggravating and mitigating factors in accordance with N.J.S.A. 2C:44-1(a)-(b), the trial court sentenced defendant to an aggregate term of life plus thirty-five years, with a total period of parole ineligibility of more than eighty-five years.[3]

Defendant appealed his convictions and sentence. In an unpublished per curiam opinion, an appellate panel reversed defendant's convictions. The panel held that both trial courts committed plain error when they permitted the two juries unrestricted access to videotaped statements during deliberations. The panel reasoned that the trial courts failed to adhere to the procedures set forth in State v. Michaels, 264 N.J. Super. 579, 643-45 (App. Div. 1993), aff'd on other

---

[3] The trial court sentenced defendant to a life sentence for his first-degree murder conviction. It sentenced defendant to a term of thirty years' imprisonment for his first-degree kidnapping conviction and a term of five years' imprisonment for his conviction for third-degree terroristic threats, both terms to run consecutively to defendant's term of life imprisonment, and both subject to the parole ineligibility provisions of the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The court sentenced defendant to a term of thirty years' imprisonment, subject to NERA, for his first-degree carjacking conviction; a term of five years' imprisonment for his conviction for third-degree possession of a weapon without a permit; a term of five years' imprisonment for his conviction for witness tampering; and a term of five years for his conviction for hindering apprehension. All terms were to be served concurrently with his life term for first-degree murder. The remaining offenses were merged into other offenses. Defendant was awarded 841 days in jail credit toward his sentence.

grounds, 136 N.J. 299 (1994), and applied to pretrial statements by this Court in State v. Burr, 195 N.J. 119, 134 (2008).  It held that the juries' access to the videotaped statements may have resulted in substantial prejudice to defendant and that, in the absence of direct physical evidence linking defendant to Phillips's murder, the error was not harmless.[4]

We granted the State's petition for certification.  217 N.J. 287 (2014).

### III.

The State concedes that the trial courts in both trials committed a "procedural lapse" when they allowed the two juries unsupervised access to the videotaped statements during deliberations.  It contends, however, that the trial courts' errors do not compel reversal of defendant's convictions.  The State argues that the Appellate Division improperly applied the plain error standard, which requires a finding that the error was "clearly capable of producing an unjust result," to this

---

[4] The Appellate Division did not reach the remaining issues raised by defendant:  whether the jury instruction on terroristic threats in defendant's first trial failed to clearly state the crime of violence threatened; whether defendant was denied the effective assistance of trial counsel in both trials because his counsel failed to file a motion for a hearing pursuant to United States v. Wade, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967), with respect to his identification by D.C. and Q.M. based on a single photograph; and whether the sentencing court improperly imposed consecutive sentences, imposed an illegal sentence, and imposed a sentence that was manifestly excessive.

15

case.  It asserts that the panel ignored the strength of the evidence independent of the statements that supported defendant's convictions.

Defendant argues that his right to a fair trial was violated when the videotaped statements of D.C. and Q.M. in the first trial, and the videotaped statement of Q.M. in the second trial, were in the juries' possession during deliberations.  He contends that both trial judges violated this Court's directive in Burr, supra, 195 N.J. at 134-35, and its progeny.  Defendant notes that neither jury requested a playback of the videotaped statements, and that the trial courts apparently viewed the juries' access to those statements as a routine matter.  He argues that because his convictions turned on identification, and the disputed videotaped statements contradicted the testimony of two eyewitnesses, the juries' unfettered access to those statements was "clearly capable of producing an unjust result," and therefore constituted reversible error under both the "plain error" and "harmful error" standards.  Defendant asserts that there was no forensic evidence supporting his convictions and that the witnesses whose statements are at issue were critically important in both trials.

IV.

A.

16

As the State and defendant agree, a trial court should not permit a jury to have unrestricted access during deliberations to the videotaped pretrial statements of witnesses. That rule constitutes an exception to Rule 1:8-8(a), which broadly permits a jury to "take into the jury room the exhibits received in evidence . . . ." As this Court recently noted, "video-recorded statements have been considered a different type of exhibit, a hybrid that is both a demonstrative exhibit and testimony." State v. A.R., 213 N.J. 542, 560 (2013) (citing Burr, supra, 195 N.J. at 134). "The video recording is the functional equivalent of a live witness and can be particularly persuasive." Ibid. (citing United States v. Binder, 769 F.2d 595, 600 (9th Cir. 1985)). As such, a videotaped statement requires special consideration by a court overseeing a trial that has reached the deliberation stage.

Our appellate courts first confronted the question of jury access to a videotape of a witness in the context of recorded trial testimony in Michaels, supra, 264 N.J. Super. at 641-42. There, shortly after it began deliberations in the trial of a teacher charged with sexual misconduct allegedly involving twenty of her students, the jury asked to view the videotaped testimony of the child victims and to deliberate following its review of each child's testimony. Id. at 585, 642. The trial court permitted the jury to review the videotaped testimony, in

17

open court and under the supervision of the judge. Id. at 642. An appellate panel held that, although it would be error to permit the jury to have the videotaped testimony in the jury room during deliberations, it was not error for the testimony to be replayed in open court. Id. at 643-44. It commented, "we cannot say that the replay of child-testimonial videotapes is prejudicial per se or that because of the impact of the visual image, the trial judge should be divested of discretion to accede to a jury's request for a replay." Id. at 644. The panel recommended the following procedures to guide trial judges confronted with a jury request such as the one made by the jury in Michaels:

> A trial judge should first seek to satisfy a jury request for playback of videotaped testimony by offering a reading of the transcript of the testimony. The trial judge should inquire of the jury as to whether there is something the jurors are seeking from the videotape which would be unavailable to them from an impartial reading of the witness' testimony. If it is determined that the jury's request for a replay of the tape appears reasonably necessary to its deliberations, then the trial judge should exercise discretion to balance that need against any possible prejudice in each particular case.
>
> [Id. at 644-45 (citations omitted).]

In Burr, supra, this Court applied the guidelines set forth in Michaels to videotaped pretrial statements of child victims in the trial of a defendant charged with second-degree sexual

18

assault, N.J.S.A. 2C:14-2(b), and third-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a). 195 N.J. at 122, 132-35. There, during its deliberations, the jury requested access to videotapes that had been marked as exhibits and admitted into evidence. Id. at 131-32. Over the defendant's objection, the trial court permitted the videotaped statements of a child victim to be replayed for the jury in open court. Id. at 132. The Appellate Division reversed defendant's convictions on several grounds, holding that the trial court abused its discretion by permitting replay of the child's testimony without inquiring into the jury's need for that replay and balancing that need against any consequent prejudice to the defendant. Ibid.

This Court concurred with the Appellate Division in Burr that the defendant was entitled to a new trial, affirmed and modified the panel's judgment, and remanded the case to the trial court. Id. at 133-35. The Court shared the Appellate Division's "concern that allowing a jury unfettered access to video-taped witness statements could have much the same prejudicial effect as allowing a jury unrestricted access to videotaped testimony during deliberations." Id. at 134. The Court instructed the trial court, if faced on remand with a jury request for a replay of the victim's pretrial interview during deliberations, to take specific steps. Id. at 135. First, the

trial court was directed to inquire whether the jury would be satisfied by a readback of the testimony.  Ibid.  Second, in the event that the jury persisted in its request for a video replay, the trial court was instructed to "take into consideration fairness to the defendant."  Ibid.  Third, the court was charged to ensure that any video playback was accompanied by a readback of direct and cross-examination of the witness that is necessary to provide context.  Ibid.  Fourth, the trial court would have the discretion to deny the jury request upon a showing "that the consequential prejudice to the defendant from the playback could not be ameliorated through other means."  Ibid.  Finally, this Court required that any playback, and accompanying readback, occur in open court.  Ibid.

In State v. Miller, 205 N.J. 109, 114 (2011), this Court again considered a jury request to view a videotape during deliberations, this time a recording of a witness's trial testimony.  Finding no error in the trial court's decision to grant the jury's request, the Court directed trial courts to focus "on the proper controls and limits needed to ensure a fair proceeding, not the medium used to create a record."  Id. at 121-22.  The Court suggested several precautions for trial courts to use if asked to play trial testimony before a deliberating jury.  Id. at 122-23.

20

Shortly after it decided Miller, the Court addressed the different context of a videotaped confession in State v. W.B., 205 N.J. 588, 622-23 (2011). There, the Court declined to find an abuse of discretion in the trial court's replay, in open court, of the defendant's videotaped confession, where no transcript of the trial was available as a potential alternative means of responding to the jury's request. Id. at 623.

The Court's most recent exploration of this issue is found in A.R., supra, 213 N.J. at 552-64. In A.R., the trial court had admitted into evidence videotaped interviews with the defendant, accused of sexual assault, and with the child who was his alleged victim. Id. at 549. With no objection from the defendant or the State, the trial court permitted the jury to view the videotapes in the jury room during deliberations. Id. at 549-50. The Appellate Division reversed the conviction. Id. at 551. This Court reaffirmed the message of its previous jurisprudence: "a video-recorded statement must be replayed in open court under the direct supervision of the judge." Id. at 546. The Court noted that even when the testimony recorded is "admissible evidence, playbacks of such testimony have the capacity to permit a jury to place undue emphasis on a single item of evidence." Ibid. The Court held, however, that the trial court's error was "no more than a procedural lapse" and that because defense counsel had urged the jury to view the

21

videotaped statements during deliberations, the doctrine of invited error applied.  Id. at 557, 562.  Acknowledging "the strength of the evidence adduced by the State in support of defendant's conviction and the nature of the error," which "did not constitute structural error and . . . did not compromise the fairness of the trial," this Court reversed the judgment of the Appellate Division and reinstated the defendant's conviction. Id. at 563-64.

These cases state a consistent principle:  because a jury's review of a videotaped witness statement or testimony raises concerns that a particular segment will be overemphasized or viewed out of context, any replay of such a statement or testimony must be conducted in open court, under the careful supervision of the trial judge.  Id. at 546, 559-61; Miller, supra, 205 N.J. at 122-23; Burr, supra, 195 N.J. at 131-33; Michaels, supra, 264 N.J. Super. at 643-45.  The case law also instructs that a replay of a videotaped statement during deliberations should only be conducted upon the jury's request, and after a determination that the jury's concerns cannot be addressed with a readback of testimony.  A.R., supra, 213 N.J. at 560-61; Burr, supra, 195 N.J. at 133-35; Michaels, supra, 264 N.J. Super. at 644-45.

The seasoned trial judges who oversaw defendant's trials effectively addressed most of the issues that arose in the

22

course of the proceedings, but they did not follow the procedures set forth in Michaels, Burr, and the Court's later authority. First, the jury did not request a replay of the videotaped statements in dispute. In the first trial, the jury expressed no interest in reviewing the videotaped statements of D.C. or Q.M.; the suggestion that it be permitted to do so came from the State, which used a portion of its summation to encourage the jury to watch the videotapes. In the second trial, the State similarly proposed that the Court make the videotaped statement of Q.M. available to the jurors; the jury did not request to review that statement. Second, the trial courts did not follow the guidelines established by our case law to ensure that any jury review of the videotape was conducted in open court, with the trial judge retaining control over the replay process, and trial testimony read back as necessary to provide context. See A.R., supra, 213 N.J. at 560-61; Miller, supra, 205 N.J. at 122-23; Burr, supra, 195 N.J. at 133-35; Michaels, supra, 264 N.J. Super. at 644-45.

We therefore agree with the Appellate Division that it was error for the trial courts to permit the juries to have unsupervised access to the videotaped statements during deliberations. We reiterate that trial courts should make videotaped statements and testimony available to jurors during deliberations only in the event of a jury request, and solely in

23

accordance with the guidelines set forth in our prior law.  See

A.R., supra, 213 N.J. at 546, 559-61; W.B., supra, 205 N.J. at

622; Miller, supra, 205 N.J. at 122-24; Burr, supra, 195 N.J. at

134-35; Michaels, supra, 264 N.J. Super. at 644-45.

B.

It is undisputed that defendant did not object in either of

his trials to the juries' unsupervised access to the witnesses'

videotaped pretrial statements, which were properly admitted

into evidence.[5]  Accordingly, as did the Appellate Division, we

review whether the jury's access during deliberations to the

D.C. and Q.M. videotaped pretrial statements constituted plain

error.

Plain error is error that "is 'clearly capable of producing

an unjust result.'"  State v. Singleton, 211 N.J. 157, 182-83

(2012) (quoting R. 2:10-2); State v. Reeds, 197 N.J. 280, 298

(2009).  "The error must have been of sufficient magnitude to

---

[5] Shortly before the jury in the first trial returned a verdict, defense counsel raised a question about the trial court's handling of the videotaped statements, suggesting that his decision not to object to the procedure used by the trial court had been an error.  He did so after urging the jury in summation to view D.C.'s statement, declining to object to the procedure before the jury was provided with the DVDs, and failing to raise a question about the issue during two days of deliberation.  This untimely objection does not alter the standard of review.  See R. 1:7-2 (requiring objection "at the time the ruling or order is made or sought"); Pressler & Verniero, Current N.J. Court Rules, comment 2 on R. 1:7-2 (2015) (noting need to provide court with basis of complaint to permit opportunity to respond) (citing State v. Maisonet, 166 N.J. 9, 20 (2001)).

24

raise a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached." Pressler & Verniero, Current N.J. Court Rules, comment 2.1 on R. 2:10-2 (citations omitted); see also State v. Winder, 200 N.J. 231, 252-53 (2009) (considering substance of trial court's voir dire and finding no plain error). As the Court has held, "to rerun a trial when the error could easily have been cured on request, would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal." State v. Macon, 57 N.J. 325, 333 (1971). It is defendant's burden to demonstrate that the trial courts' procedures constituted plain error. See State v. Morton, 155 N.J. 383, 421 (1998), cert. denied, 532 U.S. 931, 121 S. Ct. 1380, 149 L. Ed. 2d 306 (2001); State v. Chew, 150 N.J. 30, 82 (1997) (citing United States v. Olano, 507 U.S. 725, 734, 113 S. Ct. 1770, 1777, 123 L. Ed. 2d 508, 520 (1993)), cert. denied, 528 U.S. 1052, 120 S. Ct. 593, 145 L. Ed. 2d 493 (1999); State v. Tierney, 356 N.J. Super. 468, 477 (App. Div.) (citations omitted), certif. denied, 176 N.J. 72 (2003).

In determining whether defendant has demonstrated that the errors here had "'a clear capacity to bring about an unjust result,'" we assess "'the overall strength of the State's case.'" State v. Nero, 195 N.J. 397, 407 (2008) (quoting State v. Chapland, 187 N.J. 275, 288-89 (2006)); see also State v. Sowell, 213 N.J. 89, 107-08 (2013) (affirming conviction given

25

strength of evidence against defendant despite admission of improper expert testimony).  We undertake that analysis in light of the unusual setting presented in this case, in which there is no possibility that the jury had access to inadmissible evidence that might improperly affect the outcome of a trial.  Cf. State v. Kociolek, 20 N.J. 92, 103-05 (1955) (reversing conviction because jury learned during deliberations of "illegal and extraneous evidence" that defendant had been indicted on unrelated matter); State v. Conigliaro, 356 N.J. Super. 54, 69-70 (App. Div. 2002) (reversing conviction because jury had access, during deliberations, to inadmissible statement written by victim).  Instead, this case concerns the properly admitted pretrial statements of two witnesses, both of whom testified before the jury and were cross-examined at trial.  At most, the trial courts' procedural errors raise the possibility that the jurors viewed the videotaped statements in the jury room, and that in doing so, they afforded disproportionate attention to those statements compared to other evidence admitted at trial. Accordingly, to determine whether the jurors' access to the properly admitted videotaped pretrial statements was "clearly capable of producing an unjust result," we consider the import of those statements in the context of the State's evidence as a whole.

26

The jury's access to D.C.'s videotaped statement during deliberations in the first trial clearly did not deprive defendant of a fair trial. Defendant presented the statement to the jury, and his counsel affirmatively relied on it in summation; D.C.'s confusing responses to police interrogation on videotape had the potential to undermine the child's incriminating testimony about defendant on the witness stand.

In his videotaped statement, D.C. gave three contradictory accounts of Phillips's murder. Initially, D.C. denied having witnessed the murder, stating that his nine-year-old friend Isaiah was present at the scene and told him about the shooting after it occurred, and that the two boys then went to the dumpster and saw the victim bleeding from the head. In other portions of his statement, D.C. indicated that he himself had witnessed the shooting. He recounted that the shooter and the victim arrived in a green van or green truck, that the shooter was holding a handgun, and that the victim was in the dumpster on his knees. In the same videotaped statement, D.C. gave an alternative version of the murder, in which the victim emerged from a house and was shot after trying to escape from the shooter in his vehicle. D.C. said that he recognized defendant as the shooter because he had seen him on two prior occasions.

In contrast, D.C.'s trial testimony at both trials provided a consistent account of the shooting, albeit one that diverged

27

from the accounts given by Hunter in his pretrial statement and testimony, and Q.M. in his pretrial statement. D.C. testified at both trials that he personally witnessed the shooting. He stated that he thought Phillips had emerged from someone's house and tried to escape in his car, that Phillips was then accosted by three men, two of whom left, and that defendant forced him from his car into the dumpster and shot him.

If, as defendant suggests, jurors in the first trial may have viewed D.C.'s videotaped statement and relied on it more than they relied on the witness's trial testimony, then that could only have weakened the State's case. The trial court's decision to allow the jury in the first trial to have D.C.'s videotaped statement during deliberations did not constitute plain error.

In the case of Q.M., whose videotaped pretrial statement was in the juries' possession in both trials, application of the plain error standard requires a more detailed inquiry. In his pretrial statement, Q.M. incriminated defendant. Prior to defendant's first trial, Q.M. recanted his statement and claimed that it had been prompted by police coercion. Testifying in both trials, Q.M. disclaimed any knowledge of Phillips's murder and contended that the details provided in his statement had been supplied to him by police officers. In order to determine whether the juries' access to Q.M.'s pretrial statement during

28

deliberations was "clearly capable of producing an unjust result," we consider the strength of the other evidence presented by the State, some of which directly corroborated Q.M.'s pretrial statement, and none of which supported his testimony at trial.

First, Hunter's trial testimony substantially corroborated the account of Phillips's murder given by Q.M. in his pretrial statement. As did Q.M. in his pretrial statement, Hunter testified that defendant arrived at the crime scene driving an SUV with Phillips in the back of the vehicle. Hunter stated that defendant ordered the victim out of the car and into the dumpster, and then shot him. In his pretrial statement, Q.M. said that defendant got out of the driver's seat, opened the back, and told the victim to get into the dumpster; Q.M. said that defendant told him that the victim "put his head down" in his hands in the dumpster and "basically started crying."[6] There were some discrepancies between their accounts. Hunter recalled that the SUV was black, while Q.M. recalled a grey SUV. In the first trial, Hunter recounted that three shots were fired; in the second, he recalled three or four, while Q.M.'s statement

---

[6] In his trial testimony in defendant's first trial, after he had recanted his pretrial statement, Q.M. told the jury that he had "made up" his statement regarding the victim putting his head in his hands in the dumpster because he "thought it would be funny."

29

reflected that defendant shot Phillips twice. Their accounts of the shooting, however, were essentially consistent. Significantly, both witnesses were extensively cross-examined before the trial juries.

Second, testimony about Phillips's boxing gloves substantially buttressed Q.M.'s pretrial statement and undermined the credibility of his recantation at trial. Q.M. told police in his pretrial statement that, after defendant ordered him into the victim's Durango and directed him to dispose of the gun, he took boxing gloves from the vehicle, and that the gloves were currently at his home. Following Q.M.'s statement, Phillips's boxing gloves were found by police in a consent search of Q.M.'s home. In both trials, Phillips's girlfriend identified the boxing gloves found in Q.M.'s home as his; in the second trial, she added that she had previously seen the boxing gloves in Phillips's vehicle. Thus, the officers' recovery of the boxing gloves in Q.M.'s home, and the victim's girlfriend's identification of those gloves, corroborated Q.M.'s pretrial statement in this critical respect. In contrast, Q.M.'s testimony at trial about the boxing gloves -- that he had not obtained them from the victim's vehicle, but instead found the gloves "in the park one day" -- was not corroborated by any other evidence admitted at trial.

Third, Q.M.'s discussion, in his pretrial statement, of the gun used to kill Phillips was substantially corroborated by other evidence. Q.M. stated that approximately an hour and a half after the murder, defendant pulled over in the victim's SUV, dropped a gun in Q.M.'s lap and ordered him to "stash" it. Q.M. testified that he threw the gun in a field near a tree.[7] He said that defendant later told him that he retrieved the gun. A gun was later recovered from an individual arrested in Newark for possession of a firearm, who stated that his cousin and he had found the gun a few minutes before his arrest in the grass in Ivy Hill Park. The gun was identified by Hunter, with more certainty in the first trial than in the second, as the weapon used by defendant to threaten Hunter three days before Phillips's murder. On the basis of a shell casing found at the scene and two projectiles removed during Phillips's autopsy, the gun found in Ivy Hill Park was identified by a ballistics expert as the weapon used in Phillips's murder. Thus, Q.M.'s account of his disposal of the gun, given in his pretrial statement and later recanted, is consistent with other evidence admitted at both trials.

_____

[7] The transcript of Q.M.'s statement quotes Q.M. as stating that he "threw [the gun] in the field on Harriman," which the court reporter noted was a phonetic transcription of a street identified by Q.M. It is unclear from the transcript where the field described by Q.M. was actually located.

Finally, Q.M. told police in his pretrial statement that defendant told Q.M. that defendant had taken from Phillips a cell phone, described by Q.M. as a blue "I.A. 60" phone that was a "chirp." At trial, Phillips's girlfriend testified that the victim had a blue, black and silver Nextel flip cell phone. The cell phone was not recovered. In the testimony that he gave after recanting his statement in the first trial, Q.M. stated that although other details of his statement had been dictated by police officers, he "made up" his description of the color of the victim's cell phone. The consistency between Q.M.'s description of the cell phone, and the description provided by the victim's girlfriend in her testimony, supports the credibility of Q.M.'s pretrial statement, and undermines his explanation at trial.

In short, to the extent that the jury weighed the credibility of Q.M.'s pretrial statement against the credibility of his trial testimony recanting that statement, substantial evidence, independent of Q.M., corroborated the account that he originally gave police. In contrast, Q.M.'s attempts to explain away the details contained in his pretrial statement, and to account for his possession of the victim's boxing gloves, found no support in the other evidence in the trial record. The juries saw Q.M. testify, heard his account, and had ample opportunity to form a judgment about his credibility that need

32

not be interfered with on the basis of any other evidence presenting a clear capacity that an unjust result was reached.

As reflected by defendant's affirmative use of D.C.'s pretrial statement, that statement was substantially less incriminatory than D.C.'s testimony at trial. If the jury decided that Q.M.'s pretrial statement was more credible than his trial testimony recanting his statement, such a determination found robust support in other evidence admitted in both trials. It is not only unlikely, but virtually inconceivable, that either verdict was driven by the jury's unsupervised access to the videotaped version of the properly admitted pretrial statements, rather than by the jury's evaluation of the evidence. In light of the evidence admitted in both of defendant's trials, the jurors' unsupervised access to D.C.'s videotaped pretrial statement during deliberations in the first trial, and to Q.M.'s videotaped pretrial statement during deliberations in both trials, was not "clearly capable of producing an unjust result." R. 2:10-2. Neither trial judge committed plain error; in both cases, defendant received a fair trial.

Notwithstanding our review of defendant's trials under the plain error standard that governs this case, we reiterate our adherence to the rule of Michaels, supra, 264 N.J. Super. at 644-45, Burr, supra, 195 N.J. at 132-34, Miller, supra, 205 N.J.

at 122-23, and A.R., supra, 213 N.J. at 546, 559-61.  When videotaped pretrial statements or trial testimony are admitted into evidence, deliberating juries should view them only if they request to do so, and then only in open court under the supervision of the trial judge.

## V.

The judgment of the Appellate Division is reversed.  The matter is remanded to the Appellate Division for consideration of the issues that it did not reach in its opinion in this case.


CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, FERNANDEZ-VINA, and SOLOMON; and JUDGE CUFF (temporarily assigned) join in JUSTICE PATTERSON's opinion.

SUPREME COURT OF NEW JERSEY

NO.     A-61                          SEPTEMBER TERM 2013

ON CERTIFICATION TO _____Appellate Division, Superior Court_____


STATE OF NEW JERSEY,

        Plaintiff-Appellant,

                v.

DARIEN WESTON,

        Defendant-Respondent.


DECIDED _____June 25, 2015_____
        _____Chief Justice Rabner_____     PRESIDING
OPINION BY _____Justice Patterson_____
CONCURRING/DISSENTING OPINIONS BY _____
DISSENTING OPINION BY _____

| CHECKLIST | REVERSE AND REMAND | |
|---|---|---|
| CHIEF JUSTICE RABNER | X | |
| JUSTICE LaVECCHIA | X | |
| JUSTICE ALBIN | X | |
| JUSTICE PATTERSON | X | |
| JUSTICE FERNANDEZ-VINA | X | |
| JUSTICE SOLOMON | X | |
| JUDGE CUFF (t/a) | X | |
| TOTALS | 7 | |