**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3161-16T3

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

AMRIT SINGH, a/k/a
ANDY SINGH

      Defendant-Appellant.

_____

          Submitted January 9, 2019 – Decided July 5, 2019

          Before Judges Nugent, Reisner and Mawla.

          On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 15-04-0436 and 15-04-0437.

          Joseph E. Krakora, Public Defender, attorney for appellant (Margaret Ruth McLane, Assistant Deputy Public Defender, of counsel and on the briefs).

          Andrew C. Carey, Middlesex County Prosecutor, attorney for respondent (Nancy Anne Hulett, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant appeals from judgments of conviction for armed robbery, two weapons offenses, resisting arrest, and certain persons not to have weapons. Asking us to overturn the jury's verdict and vacate his aggregate fifteen-year sentence, defendant argues the following points:

> POINT I
> THE PROSECUTOR ELICITED IMPROPER LAY-WITNESS OPINION TESTIMONY AS TO THE CONTENT OF THE SURVEILLANCE VIDEO AND THE IDENTITY OF THE ROBBER.
>
> POINT II
> THE FAILURE TO PROPERLY INSTRUCT THE JURY ON HOW TO CONSIDER THE VIDEO PLAYED BACK DURING DELIBERATIONS, AS REQUIRED BY STATE V. MILLER, NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.
>
> POINT III
> THE DEFENDANT'S AGGREGATE SENTENCE OF FIFTEEN YEARS, WITH AN 11.9-YEAR PAROLE DISQUALIFIER IS MANIFESTLY EXCESSIVE.

In view of the considerable evidence of defendant's guilt, we disagree that any errors require reversal of the jury's verdict. We find no error in the sentence proceeding. Hence we affirm.

Defendant was indicted for the following offenses: first-degree robbery, N.J.S.A. 23C:15-1 (count one); third-degree theft, N.J.S.A. 2C:20-3 (count two); third-degree possession of a knife for an unlawful purpose, N.J.S.A.

2

2C:39-4(d) (count three);[1] fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d) (count four); third-degree resisting arrest by force, N.J.S.A. 2C:29-2(a)(3) (count five); fourth-degree resisting arrest by flight, N.J.S.A. 2C:29-2(a)(2) (count six); and fourth-degree obstructing administration of law or other governmental function, N.J.S.A. 2C:29-1 (count seven). In a separate indictment, defendant was charged with fourth-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(a).

In separate trials, a jury found defendant guilty of all counts.[2] After appropriate mergers, the court sentenced defendant for first-degree robbery, count one, to a fourteen-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2. The court imposed concurrent terms for the following offenses: eighteen months for unlawful possession of a knife, count four; six months for disorderly persons resisting arrest, count five; and twelve months for fourth-degree obstructing administration of law or other governmental function, count seven. For the fourth-degree certain persons offense in the separate

[1] The judgment of conviction erroneously identifies the weapon charged in count three as explosives rather than a knife.

[2] According to the amended judgment of conviction, the jury found defendant guilty of the lesser included disorderly persons offense of resisting arrest on count five.

indictment, the court sentenced defendant to a consecutive prison term of one year.

The State presented the following evidence at trial. Shortly after ten o'clock on a January night in 2015, a man wielding a machete robbed a cashier at a gas station in Metuchen. The cashier testified the man was five feet nine inches or five feet ten inches tall, wore black clothing, and had something in his hands, perhaps gloves. The man entered the station's store and came behind the counter. His face was completely covered. He demanded the store's money. When the cashier opened the register, the robber started grabbing the money. He signaled to the cashier to empty the lottery machine but said to leave the one-dollar bills. The cashier complied. The robber demanded a bag, so the cashier got one – thin, transparent, possibly bearing the word "Thanks" – and placed the money in it. The robber grabbed the bag and ran. According to the cashier, the robber had stolen approximately $2000 to $2200.

After walking to the door and watching defendant run into the parking lot of a doughnut store adjacent to the gas station, the cashier spoke to the station's other attendant and called 9-1-1. While on the phone with a dispatcher, the cashier saw a patrol car near the doughnut store. He flagged it down, told the

officers he had been robbed, and pointed to the parking lot where he had last seen the robber fleeing.

After reporting the crime to the officers, the cashier returned to the station and sat down. His bosses arrived, as did other officers, and his bosses gave the officers a surveillance video. The cashier testified the money was returned within a couple of hours, at approximately 12:53 a.m.

During the cashier's testimony, the prosecutor played a recording of the 9-1-1 call as well as the surveillance video of the robbery. The machete was visible. As the prosecutor played the surveillance video for the jury, the cashier narrated the events and explained what the robber was saying during the course of the crime. The cashier never saw the robber's face.

Woodbridge Police Department patrolman Jeian Rastegarpanah arrested defendant. While patrolling on the night of the robbery, he received a dispatch that the gas station had just been robbed. He and his partner drove to the gas station, where he was informed that the suspect, a male wearing dark clothing, had fled South on Route 1 toward an apartment complex approximately a quarter mile away.

Rastegarpanah and his partner drove to the apartment complex's parking lot, where they saw a man in dark clothing, approximately five feet eight inches

or five feet nine inches tall near one of the buildings, with his back to the officers. They were wearing their uniforms. They exited the car and attempted to approach the man to speak with him. The man turned his head toward the officers and started running. Rastegarpanah yelled for him to stop, but the man continued to run. Rastegarpanah and his partner gave chase, radioing to headquarters that they were in a foot pursuit. The man they were chasing dropped a shopping bag. Rastegarpanah lost sight of the man as he ran down a street in a residential area near the apartment complex.

As Rastegarpanah began to check cars in the residential area, he noticed a fence gate was open. He walked into the backyard of the residence. Using his flashlight, he noticed a black sweatshirt on the ground. He drew his service weapon, shone his flashlight, and saw defendant pressed up against the back of the house. Rastegarpanah testified defendant was approximately five feet eight inches or five feet nine inches tall, wearing dark clothing, sweating, and breathing heavy.

Rastegarpanah told defendant to get on the ground. Defendant said he was just trying to score some drugs. Unsure if defendant had a knife, Rastegarpanah again ordered him to the ground. The officer holstered his weapon, but defendant refused to put his hands behind his back and began to

A-3161-16T3

struggle. Other officers apparently heard Rastegarpanah yelling because they soon appeared on the scene. Detective Jorge Quesada helped Rastegarpanah subdue and arrest defendant. They searched him but found no weapons. Defendant sustained a head injury in the struggle, so the officers notified an ambulance, which transported defendant to the hospital.

The officers found a multi-colored jacket on the ground where defendant had been pressed against the wall of the house. Defendant's driver's license was in a pocket. According to the driver's license, defendant was five feet seven inches tall. The only other item the officer found in the yard, besides the black sweatshirt, was an ear warmer.

Rastegarpanah returned to the area where defendant had discarded the shopping bag. He found a hat, the bag, which contained the proceeds from the robbery, and a machete.

Rastegarpanah identified defendant as the man he pursued and arrested. He specifically identified defendant as the man he first encountered in the parking lot of the apartment complex near one of the buildings.

Detective Jorge Quesada, who assisted Rastegarpanah with arresting defendant, entered the backyard of the house and saw Rastegarpanah struggling with defendant. Defendant refused to stop, so Quesada helped Rastegarpanah

subdue and handcuff him. Quesada testified defendant was dressed in black and his shoes had a white sole with stripes.

During Quesada's testimony, the prosecutor played the surveillance video of the robbery and had the detective comment on it. The detective first commented, "[t]his is where the suspect is approaching the gas station, the inside store." As the video continued to play, the detective noted, "[t]hat's when the defendant is there pointing the knife at the gas station attendant." Later, he added: "[r]ight here he's demanding for the money, and pointing the knife at the victim."

The prosecutor next had the detective explain the events on the video as depicted from another angle. The detective gave the following narration:

> The suspect, at the first shot, was him coming around the dumpster area of the gas station, coming around the store, and then coming up into the front door here. He's walking in, you see him going to the right. And as he approaches with the knife in front of the victim's body there. He opens the door, starts demanding the money, and I - - I believe that he instructed him - - he knew about the second register, the second drawer, to get the money out of that drawer.

The detective described the shoes the perpetrator was wearing: white soles at the bottom, with three stripes going down the side. The detective also pointed

out that the perpetrator was wearing two pairs of gloves, one of which bore an insignia on the top of the left-hand glove.

Defense counsel did not object to the narration. When the prosecutor asked the detective to identify a pair of sneakers that had been marked as an exhibit, the detective testified without objection they were the sneakers defendant was wearing when arrested. When the detective attempted to continue with his answer, defense counsel timely objected. His objection was indiscernible and none of the parties has attempted to reconstruct it. In response to the objection, the court ruled that the detective could testify the sneakers looked like the ones seen on the robber in the surveillance video. Questioning resumed and the detective responded "[y]es" to the prosecutor's question, "are those sneakers similar to the sneakers that you just observed - - we observed here in court today, on video?"

The State presented the testimony of a crime scene investigator and forensic experts. No fingerprints could be recovered from any of the seized items and the only evidence tested for DNA was a hat the police retrieved. No conclusions could be drawn about who contributed the three distinct DNA samples from the hat. Although a t-shirt, sweatshirt, and ear warmer were sent to the crime lab for DNA testing, none of the items was tested, because they

were incorrectly coded as having been taken from defendant. Lab technicians saw the coding and assumed that because they were purportedly taken from defendant DNA testing would not be helpful.

Defendant called two witnesses. The first resided in the house defendant was leaning against when arrested. The witness testified that on the night of defendant's arrest, she telephoned 9-1-1 after hearing loud noises in the backyard. She could not remember exactly what was being said, but recalled someone was saying "please don't kill me." Peering through a window, she could discern two figures. She told the 9-1-1 operator "[t]hey're like throwing people against the walls and a fistfight." The operator told her the police were in the yard and it could be them. The next day, the witness saw blood on the wall where the figures were fighting. The blood had not been there the previous day.

Defendant also presented the testimony of a police officer who had responded to the yard where defendant was arrested. His police car was equipped with an "MVR," which he described as a "camera linked with an audio device" that was activated when the emergency lights were activated. The audio recorder had an unidentified officer asking defendant, "[w]here is the knife?"

When defendant responded he had no knife, the officer responded, "we're going to find it. It's going to have your DNA on it."

The jury rejected the defense theory that Officer Rastegarpanah mistakenly identified defendant, who was out trying to score drugs, as the person the officer saw drop the bag with the robbery proceeds and the machete used in the robbery. Rather, they convicted him on all counts in the two indictments.

On appeal, defendant first argues the prosecutor elicited improper lay opinion testimony from Detective Quesada when he had Quesada narrate the video surveillance tape.

Preliminarily, we note that contrary to defendant's assertion on appeal, he did not object to the detective's narration of the surveillance video. When a defendant raises an issue for the first time on appeal, we review the action or omission complained of for plain error. R. 2:10-2. Under this standard of review, we disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result[.]" Ibid. The error must have been "sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached[.]" State v. McGuire, 419 N.J. Super. 88, 106-07 (App. Div. 2011) (alteration is original) (quoting State v. Taffaro, 195 N.J. 442, 454 (2008)).

"Plain error is a high bar[.]" State v. Santamaria, 236 N.J. 390, 404 (2019).

> A defendant who does not raise an issue before a trial court bears the burden of establishing that the trial court's actions constituted plain error because to rerun a trial when the error could easily have been cured on request[] would reward the litigant who suffers an error for tactical advantage either in the trial or on appeal.
>
> [Id. at 404-05. (alteration in original) (citations omitted).]

Quesada's narration of the surveillance video was inadmissible lay opinion testimony, and his implied and explicit identification of defendant as the robber was improper. A lay witness may give "testimony in the form of opinions" if they are "rationally based on the perception of the witness and . . . will assist in understanding the witness's testimony or in determining a fact in issue." N.J.R.E. 701; see also State v. Lazo, 209 N.J. 9, 22 (2012). "The Rule does not permit a witness to offer a lay opinion on a matter not within [the witness's] direct ken . . . and as to which the jury is as competent as [the witness] to form a conclusion[.]" State v. McLean, 205 N.J. 438, 459 (2011) (alterations in original) (citation omitted). "[L]ay opinion testimony is limited to what was directly perceived by the witness and may not rest on otherwise inadmissible hearsay." Id. at 460.

A-3161-16T3

Although Quesada should not have been permitted to narrate the film, and certainly should have not been permitted to identify defendant, defendant has not sustained his burden of establishing that the improper testimony raises a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached. There is little, if any, doubt that Officer Rastegarpanah encountered the robber while the robber still possessed the bag of cash and the machete. Although the officer lost sight of the robber after the robber dropped the cash and weapon, the circumstantial evidence culminating in defendant's arrest was compelling. Moreover, the patrolman identified defendant as the person he initially confronted, the person who dropped the bag, and the person he ultimately arrested after a struggle in a residential backyard. Given such strong evidence, we find no plain error in the admission of Quesada's improper narration of the surveillance video.

Defendant next claims it was reversible error for the trial court not to instruct the jury on how to consider the surveillance video when it was played back during their deliberations. During deliberations, several times, the jurors requested to have the surveillance video played back. Defendant eventually asked the court to instruct the jury on the proper use of the video. Defendant relied upon State v. Miller, 205 N.J. 109 (2011), as he does on this appeal.

13

Miller is inapposite. The case involved video-recorded witness testimony. Id. at 114. In contrast, the surveillance testimony here did not include a witness's statement or testimony. The Supreme Court has noted a video of a statement or testimony "is the functional equivalent of a live witness and can be particularly persuasive." State v. Weston, 222 N.J. 277, 289 (2015) (quoting State v. A.R., 213 N.J. 542, 560 (2013)). For that reason, "a videotaped statement requires special consideration by a court overseeing a trial that has reached the deliberation stage." Ibid.

Here, the surveillance video did not contain testimony from a witness. In fact, it contained no sound at all. Thus, the concerns the Supreme Court has repeatedly expressed about videotaped testimony or witness statements are not present here. In contrast, the jurors had before them actual video of the crime itself. If the trial court did err by not cautioning the jury to consider all of the evidence presented by the parties, not merely the evidence of the robbery unfolding in real time, the error was harmless, particularly in view of the strength of the State's other evidence. R. 2:10-2.

In his last argument, defendant contends his sentence is excessive. We review the sentence the trial judge has imposed under an abuse of discretion standard. State v. Miller, 237 N.J. 15, 28 (2019). "[A]ppellate courts are

14                                                          A-3161-16T3

cautioned not to substitute their judgment for those of our sentencing courts." Ibid. (alteration in original) (quoting State v. Case, 220 N.J. 49, 65 (2014)). For that reason, appellate courts must affirm the sentence unless a trial court has violated the sentencing guidelines, found aggravating or mitigating factors not based on competent and credible evidence in the record, or has applied the guidelines in such a manner as to "make[] the sentence clearly unreasonable so as to shock the judicial conscience." Id. at 28 (quoting State v Fuentes, 217 N.J. 57, 70 (2014)).

The record demonstrates the trial court in the case before us followed the sentencing guidelines and based its decision concerning aggravating and mitigating factors on competent and credible evidence in the record. The sentence falls well within the sentencing guidelines, is not clearly unreasonable, and does not shock the judicial conscience. Accordingly, we affirm it.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION