**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1176-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

FERREIE JOHNSON, a/k/a
FERRIE T. JOHNSON, and
FERREI JOHNSON,

     Defendant-Appellant.

_____

Argued October 28, 2025 – Decided January 23, 2026

Before Judges Sumners and Susswein (Judge Susswein concurring).

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Indictment No. 18-06-0592.

Kevin S. Finckenauer, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Kevin S. Finckenauer, of counsel and on the briefs).

Leslie-Ann M. Justus, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin,

Attorney General, attorney; Leslie-Ann M. Justus, of counsel and on the briefs).

PER CURIAM

Defendant Ferreie Johnson was convicted by a jury of the lesser-included offense of second-degree reckless manslaughter arising from the fatal shooting of Parker Sims at a Patterson nightclub parking lot. Defendant initially argues:

POINT I

THE CUSTODIAL INTERROGATION OF [DEFENDANT] SHOULD HAVE BEEN SUPPRESSED BECAUSE THE POLICE LIED ABOUT THE PURPOSE OF HIS DETENTION AND MINIMIZED THE INTERROGATION, THEREBY PRECLUDING A VALID MIRANDA[1] WAIVER.

A. THE MIRANDA HEARING AND DECISION.

B. A VOLUNTARY WAIVER OF MIRANDA RIGHTS MUST BE ESTABLISHED BEYOND A REASONABLE DOUBT, AND ANY SUCH WAIVER MAY NOT BE OBTAINED THROUGH DECEPTION, MINIMIZATION, OR MANIPULATION OF THE PROCEEDINGS.

C. LAW ENFORCEMENT MINIMIZED AND MISPRESENTED THE TRUE NATURE OF THE INTERROGATION TO OVERCOME [DEFENDANT'S] EQUIVOCAL STATEMENTS ABOUT POSSIBLY

---

[1] Miranda v. Arizona, 384 U.S. 436 (1966).

A-1176-22

INVOKING HIS RIGHTS AND INDUCE HIM TO WAIVE.

D. THE IMPROPER ADMISSION OF THE STATEMENT WAS REVERSIBLE ERROR.

POINT II

SERGEANT MARTINEZ IMPROPERLY NARRATED EVENTS CONTAINED IN THE SURVEILLANCE VIDEO OF WHICH HE HAD NO FIRSTHAND KNOWLEDGE AND THAT THE JURY WAS ABLE TO EVALUATE FOR ITSELF, INCLUDING REPEATEDLY TESTIFYING THAT THE FOOTAGE SHOWED [DEFENDANT] SHOOTING A GUN.

POINT III

THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT ALLOWED THE JURORS TO TAKE A LAPTOP INTO THE JURY ROOM FOR USE DURING THEIR DELIBERATIONS. (NOT RAISED BELOW)

A. ALLOWING THE JURORS UNFETTERED ACCESS TO THE SURVEILLANCE VIDEO FOOTAGE IN THE JURY ROOM WAS REVERSIBLE ERROR.

B. IT WAS OTHERWISE REVERSIBLE ERROR TO PROVIDE THE JURORS A LAPTOP FOR USE IN THEIR DELIBERATIONS.

3

POINT IV

THE TRIAL COURT ERRED IN ESTABLISHING
THE APPLICABLE SENTENCING RANGE FOR A
PERSISTENT-OFFENDER EXTENDED TERM AND
ERRED IN ASSESSING THE AGGRAVATED AND
MITIGATING FACTORS, RESULTING IN AN
EXCESSIVE, MAXIMUM EXTENDED TERM
SENTENCE.

Following the United States Supreme Court's decision in Erlinger v.

United States, 602 U.S. 821 (2024), defendant submitted a supplemental brief

per Rule 2:6-2(b), arguing:

SUPPLEMENTAL POINT

THE UNITED STATES SUPREME COURT IN
ERLINGER V. UNITED STATES HELD THAT ANY
FACTS ENHANCING A DEFENDANT'S
SENTENCE MUST BE PRESENTED TO A GRAND
JURY AND FOUND BY A PETIT JURY. BECAUSE
THE FACTS UNDERLYING THE PERSISTENT-
OFFENDER EXTENDED TERM APPLIED TO
[DEFENDANT] WERE NOT INDICTED OR FOUND
BY THE TRIAL JURY, HIS EXTENDED-TERM
SENTENCE MUST BE VACATED AND A TERM
WITHIN THE ORDINARY RANGE IMPOSED.

We reverse defendant's conviction and remand for retrial based on our

conclusion that he was denied due process and a fair trial for three reasons,

4

independently or together as cumulative error:[2]  (1) defendant's interrogation statement should not have not been admitted into evidence because it was not voluntarily given as the police deceived him into waiving his <u>Miranda</u> rights; (2) Sgt. Martinez's lay witness narration testimony identifying defendant as the person who fired the gun that killed Sims violated N.J.R.E. 701; and (3) plain error occurred when the court allowed the jury unsupervised access to view the night club surveillance video footage during its deliberations.  Accordingly, we need not address defendant's challenges to his sentence.

I.

DEFENDANT'S INTERROGATION STATEMENT

A.

In Point I, defendant argues his conviction should be reversed, entitling him to a new trial, because the admission of his custodial interrogation statement three days following Sims's death in the early hours of March 31, 2018, violated his right against self-incrimination as his <u>Miranda</u> waiver was involuntary. Following its investigation into the shooting, which included viewing

---

[2]  Cumulative error overturns a conviction where it is clear that "the cumulative effect of a series of errors is so great as to deprive a defendant of a fair trial." <u>State v. Burney</u>, 255 N.J. 1, 29 (2023) (citation omitted).

5

surveillance videos from inside and outside the nightclub, the Patterson Police took defendant to the police station where investigating Detective Sergeants Richard Martinez and Abdelmonim Hamdeh questioned him. Before he was given his Miranda rights, defendant asked if he was under arrest, and was told "no[,] . . . we got to talk to you real quick." After defendant was read his rights, he replied that he did not need a lawyer because the police reiterated "[n]o charges on you."

Thereafter, defendant stated that he drove to the nightclub in a Ford Focus with two women passengers and was present when the shooting occurred. After entering the nightclub, he recalled "see[ing] the boys that . . . we had trouble with . . . [the] people of 5th Ave" and admitted, "[w]e got into an altercation" and "start[ed] fighting." Unprovoked, defendant added, "shots got fired and my boy got shot and somebody else got killed." After the shooting erupted, defendant explained that people left the nightclub and gathered in the parking lot. While outside, two people, one in the parking lot seated in a BMW and one on the side street, started shooting at him and other patrons. Defendant claimed he ran to the car with the two girls, took cover between cars to avoid getting shot, and drove away.

6

A-1176-22

After Sgt. Martinez told defendant that the police viewed a surveillance video of him shooting, the conversation continued:

[DEFENDANT]: I'm under arrest?

[DETECTIVE]: You're not charged yet but what if I told you we got a video of you shooting?

. . . .

[DETECTIVE]: I just got the video of you shooting. You don't believe me?

[DEFENDANT]: I believe you I mean if . . . [y'all]already got that and then . . . if I'm not [under] arrest[,] I['d] rather bring in a lawyer for this.

Almost three months after defendant's interrogation, he was indicted for first-degree murder, N.J.S.A. 2C:11-3(a)(1), (2); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a); second-degree possession of a handgun without a permit, N.J.S.A. 2C:39-5(b); and second-degree certain persons not to have weapons, N.J.S.A. 2C:39-7(b).

Prior to trial, the State successfully moved to admit defendant's custodial interrogation as voluntary. The trial court recognized the police had probable cause to arrest defendant for gun possession charges at the time of the interrogation, but "they did not have any charges filed nor was [d]efendant under arrest prior to questioning." The court found the police were truthful in telling

7

defendant that he was not under arrest and he was given his Miranda rights, which he "knowingly, voluntarily, and intelligently waived." The court found that defendant understood the nature of the interrogation as he was twenty-four years old and the interrogation video footage revealed defendant was "very intelligent" given that he first asked police if he was under arrest. The court rejected defendant's contention that police employed coercive or abusive techniques to elicit his testimony. Lastly, the court ruled defendant demonstrated "a clear manifestation of his desire to waive his Miranda rights," by signing the Miranda waiver form and "actively participating in the conversation."

At the ensuing multi-day trial, the State presented portions of defendant's custodial interrogation and surveillance videos capturing what happened inside the nightclub to the shooting in the parking lot. In conjunction with the video footage shown to the jury, Sgt. Martinez provided intermittent narration, and the jury was permitted to view the surveillance video during its deliberation outside the presence of the court and the parties.[3] The State also admitted into evidence defendant's text to his friends a few days after the incident, denying his

___

[3] Defendant's arguments that these two proceedings violated his rights are addressed below.

A-1176-22

involvement in the killing, saying "honestly I didn't do it" and "I'm dropping off my strap[4] on [the] 28th."

The jury found defendant guilty of the lesser-included offense of second-degree reckless manslaughter, second-degree possession of a weapon for an unlawful purpose, and second-degree possession of a handgun without a permit. Thereafter, defendant pled guilty to the severed charge of certain persons offense. The trial court denied defendant's motion for a new trial.

The trial court granted the State's application to sentence defendant as a persistent offender to an extended term, N.J.S.A. 2C:44-3(a). After merger, defendant was sentenced to an aggregate twenty-year prison term, subject to an eighty-five percent period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2.

## B.

Defendant asserts the trial court erred in admitting his interrogation statement because his Miranda waiver was invalid; his statements were not knowingly, intelligently, and voluntarily made. Miranda, 384 U.S. at 475. He only spoke to police based on the condition that "he was not under arrest and not being questioned as a suspect in the shooting." But the police "intentionally

---

[4] Slang term for gun.

misled" him when he asked whether he was arrested and "delayed bringing charges against him to induce him to waive his <u>Miranda</u> rights" as they already had sufficient probable cause and intended to charge him with murder.

Defendant relies on <u>State v. Diaz</u>, where we held the defendant's <u>Miranda</u>'s waiver was not knowingly and voluntarily made because the police "provid[ed] a deliberately vague and incomplete answer to his question as to the reason why he was taken into custody" to induce his statements. 470 N.J. Super. 495, 518 (App. Div. 2022). Even if the officers had not affirmatively lied, it was enough that they did not tell the "whole truth" to trick the defendant into waiving. <u>Id.</u> at 519. "Any such deception or trickery as to the true reason a defendant is taken into custody . . . is an important circumstance to be considered" in determining whether a defendant validly waived his rights. <u>Ibid.</u> Defendant asserts the admission of his statements was not harmless error because witness statements and identifications obtained by police investigation before interrogating him were not admitted at trial; "the State relied almost exclusively on [his] interrogation to establish much of its theory of the case" making the admission of his statements "substantially prejudicial."

C.

"'The right against self-incrimination is guaranteed by the Fifth Amendment to the United States Constitution and this state's common law, now embodied in statute, N.J.S.A. 2A:84A-19, and evidence rule, N.J.R.E. 503.'" State v. S.S., 229 N.J. 360, 381 (2017) (quoting State v. Nyhammer, 197 N.J. 383, 399 (2009)). "To ensure that a person subject to custodial interrogation is 'adequately and effectively apprised of his [or her] rights,' the United States Supreme Court developed constitutional safeguards—the Miranda warnings." State v. A.M., 237 N.J. 384, 396 (2019) (quoting Miranda, 384 U.S. at 467). "The failure to administer Miranda warnings prior to a custodial interrogation 'creates a presumption of compulsion,' and any unwarned statements must be suppressed—even when they 'are otherwise voluntary within the meaning of the Fifth Amendment.'" State v. Tiwana, 256 N.J. 33, 41 (2023) (quoting Oregon v. Elstad, 470 U.S. 298, 307 (1985)).

A defendant's Miranda rights are "triggered only when a person is in custody and subject to questioning by law enforcement." State v. Ahmad, 246 N.J. 592, 610 (2021) (citing State v. Wint, 236 N.J. 174, 193 (2018)). "'Custody' for the purposes of Miranda requires a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" State v. Erazo, 254

N.J. 277, 298 (2023) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Whether an interview constitutes a custodial interrogation is an objective assessment based on the totality of the circumstances, including "the duration of the detention, the place and time of the interrogation, the nature of the questions and the language employed by the interrogator, the conduct of the police, the status of the interrogator, the status of the suspect, and any other relevant circumstances." State v. Brown, 352 N.J. Super. 338, 352 (App. Div. 2002) (internal citations omitted).

Notably, custody does not require a formal arrest, the use of physical restraints, or even questioning at a police station. See State v. Hubbard, 222 N.J. 249, 266 (2015). That said, "[i]f the questioning is simply part of an investigation and is not targeted at the individual because she or he is a suspect, the rights provided by Miranda are not implicated." Ibid. (quoting State v. Timmendequas, 161 N.J. 515, 614-15 (1999)) (alteration in original). However, because it is the objective circumstances of the interview that matter, it is not "dispositive whether police consider someone a 'suspect,' 'person of interest,' or 'witness.'" Erazo, 254 N.J. at 299 (citing State v. Keating, 277 N.J. Super. 141, 148 (App. Div. 1994)).

A-1176-22

Our Supreme Court clarified that while a defendant must be apprised of any formal charges against him or her—such as whether a complaint or arrest warrant has been issued—subjective predictions of the defendant's status are not per se required disclosures. See State v. Sims, 250 N.J. 189, 215-17 (2022). For instance, "police must inform the interrogee that a criminal complaint has been filed or an arrest warrant has been issued." Diaz, 470 N.J. Super. at 514 (citing State v. A.G.D., 178 N.J. 56, 58-59 (2003)). The Court recently affirmed this rule, stating "A.G.D. mandates disclosure of factual information about pending charges that the officer can readily confirm and clearly convey." Sims, 250 N.J. at 214.

Conversely, subjective impressions of what charges may be brought pursuant to "an officer's prediction, based on information learned to date in a developing investigation, of what charges may be filed" are not per se required. Id. at 215-16. The Court acknowledged, "even when there is probable cause for an arrest, there may be insufficient information about the victim's injuries, the arrestee's mental state, and other key issues to enable an officer to accurately identify the charges" and "[a]n officer acting in good faith might inadvertently misinform an arrestee as to the charges that he will eventually face." Id. at 215. This principle, however, is qualified by the fact that law enforcement officers

13

may not deliberately delay pursuing an arrest or complaint-warrant to avoid making the defendant aware of his or her potential charges. Id. at 216. Instead, the Court emphasized, "[where] there is evidence of such bad-faith conduct on the part of law enforcement officers, the trial court should consider such conduct as part of the totality-of-the-circumstances test." Ibid. As an extension of that principle, the Court noted, "evidence that the accused was threatened, tricked, or cajoled into a waiver of his [of her] privilege will render the waiver involuntary." Nyhammer, 197 N.J. at 407 (internal quotations omitted); see also Moran v. Burbine, 475 U.S. 412, 421 (1986) (holding a voluntary waiver as one that is "the product of a free and deliberate choice rather than intimidation, coercion, or deception").

For a defendant's waiver of his or her Miranda rights to be valid, the State must prove beyond a reasonable doubt that the waiver was given knowingly, voluntarily, and intelligently. Nyhammer, 197 N.J. at 400-01. A court evaluates whether the State has satisfied its burden by considering the "totality of the circumstances surrounding the custodial interrogation based on the fact-based assessments of the trial court." A.M., 237 N.J. at 398 (citing State v. Presha, 163 N.J. 304, 313 (2000)). The totality of the circumstances requires this court to consider the following factors: "defendant's 'age, education, and intelligence,

14

advice as to constitutional rights, length of detention, whether the questioning was repeated and prolonged in nature and whether physical punishment or mental exhaustion was involved.'" Sims, 250 N.J. at 217 (quoting Nyhammer, 197 N.J. at 402).

Appellate courts "review the trial court's evidentiary ruling[s] for abuse of discretion" meaning the trial court's judgment is not overruled unless it is "'so wide of the mark' that it constitutes a clear error in judgment." State v. Allen, 254 N.J. 530, 543 (2023) (internal citation omitted). When reviewing a motion to suppress statements, courts generally "defer to the factual findings of the trial court if those findings are supported by sufficient credible evidence in the record." Sims, 250 N.J. at 210 (citing S.S., 229 N.J. at 374). Deference to a trial court's factual findings is appropriate because the trial court has the "opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). Yet, a reviewing court "should engage in a 'searching and critical' review of the record to ensure protection of a defendant's constitutional rights." State v. L.H., 239 N.J. 22, 47 (2019) (quoting State v. Hreha, 217 N.J. 368, 382 (2014)). And because the trial court's legal conclusions are reviewed de novo, Hubbard, 222 N.J. at 263, an

appellate court is "not bound by a trial court's interpretations of the legal consequences that flow from established facts." Diaz, 470 N.J. Super. at 513.

D.

Based on the totality of the circumstances of defendant's interrogation, we conclude the trial court abused its discretion in admitting his interrogation statements; defendant's statements were involuntary because the police deceived him into waiving his Miranda rights. See Sims, 250 N.J. at 217. Defendant waived his rights to seek counsel after being told he was not under arrest. However, he was in fact under arrest; police had taken him into custody because they had "probable cause to believe that a crime ha[d] been committed and that [defendant] . . . committed the offense." State v. Brown, 205 N.J. 133, 144 (2015). No charges or criminal complaint needed to be issued for defendant to be under arrest. See ibid. Defendant was taken to the police station, handcuffed, and questioned about Sim's killing. The police told defendant they viewed the surveillance video footage and determined he shot Sims. Advising defendant that he was not under arrest under these circumstances was deceptive. Sgt. Martinez's suppression hearing testimony reaffirmed this, as he admitted he knew during the interrogation that he could charge defendant with gun

possession and, if defendant demanded to leave, they would call the prosecutor's office to file charges.

We disagree with the State's argument that police accurately told defendant he was not under arrest because no arrest warrant or complaint were issued. The State's argument ignores that a warrantless arrest is still an arrest for purposes of determining whether the person is in custody under Miranda. The State thus conflates two distinct legal questions: whether a person is in custody for purposes of Miranda, and whether police must advise the arrestee of the crime under investigation. Here, they deceptively minimized the reason for the interrogation to influence defendant to discuss the shooting at the nightclub. It appears the police deliberately delayed pursuing a complaint to further prevent defendant from exercising his right to counsel before giving a statement. The State cannot sustain its burden of showing beyond a reasonable doubt that defendant's waiver was voluntary.

We also disagree with the State's assertion that admission of defendant's statements was harmless and did not warrant a new trial. As set-forth in State v. Wade, our Supreme Court cautioned that "where the State's theory hinges on circumstantial evidence of a defendant's location at a particular time—a self-

identifying, self-inculpatory statement that colors the defendant as a liar is not harmless beyond a reasonable doubt."  252 N.J. 209, 221 (2022).

Defendant's interrogation statements placed him at the shooting scene— in the Ford Focus that was captured on the parking lot's surveillance footage— and revealed he got into a fight with a rival group shortly before the shooting. Defendant's custodial interrogation significantly bolstered the State's case. There was neither admission nor overwhelming evidence of defendant's guilt. The surveillance video footage and defendant's text messages, contrary to the State's assertion, do not constitute overwhelming evidence that defendant was guilty beyond a reasonable doubt of manslaughter.  Cf. State v. Derry, 250 N.J. 611, 636 (2022) (holding that admitting improper lay opinion testimony was harmless given "the overwhelming evidence against defendants").  Neither indicate that defendant fired the shot that killed Sims.  Considering the well-established principle that courts "rarely find an error to be harmless when the State violates a defendant's right against self-incrimination," Wade, 252 N.J. at 220, and the fact that this case relies primarily on circumstantial evidence, a remand for new trial, "one untainted by defendant's unlawfully obtained admissions," id. at 222, is necessary.

A-1176-22

## II.

## SGT. MARTINEZ'S LAY OPINION NARRATION TESTIMONY

## A.

In Point II, defendant argues he was denied due process and a fair trial due to Sgt. Martinez's lay opinion testimony narrating the nightclub's surveillance footage. See U.S. Const. amends. V, VI, XIV; N.J. Const. art I, ¶¶ 1, 9, 10.

During the jury trial that took place between October 4 and 14, 2022, the State played a compilation of separate surveillance videos, detailing in sequential order defendant's arrival to the club, a fight inside the club, a group of rivals shooting guns in the parking lot, and defendant allegedly returning to his car to get a gun and shoot back at the rivals in the parking lot. Sgt. Martinez commented on what was occurring in the video. Some of his commentary was objected to, some was not.

Once the video began, Sgt. Martinez testified that the car, used by rival members who fired into the crowd, "was being operated by one of the males that [defendant] . . . had an argument with inside the club." This led to a sidebar conference where the court warned the prosecutor that there was no basis for that testimony. When Sgt. Martinez stated the video showed three men who were "involved in a fight with [defendant] and his friends," defendant objected

A-1176-22

to his identification.  The trial court did not strike the comment but instead elicited the basis for Sgt. Martinez's observation by asking a series of questions, including "[s]o as part of your investigation that's where you learned that information from?"  Sgt. Martinez answered yes.

When the State moved to admit the compilation video defendant objected, stating "I don't think the narration is necessary on every single step," to which the court agreed but permitted the State to "lay a foundation" for the video clips.  The court temporarily dismissed the jury to hear defense counsel's objection of Sgt. Martinez's narration of the video footage.  Defendant argued Sgt. Martinez's presented "unnecessary narration" of the fight footage, which the trial court rejected, reasoning it "had nothing to do with proving or disproving that [defendant] is the person [who] committed the crime."  The court determined the narration was not "the least big harmful" and reiterated that no law enforcement personnel may identify defendant as the person in the surveillance footage.

Along a similar vein, the court denied defendant's objection to Sgt. Martinez's pointing out to the jury that a "group [was] approaching the entrance to [the nightclub]."  The court explained that Martinez's narration was helpful for the jury because "they don't know what they're supposed to be looking at."

A-1176-22

The trial court similarly denied defense counsel's objection to Sgt. Martinez's narration of footage showing a large group of people entering the club, stating, "those individuals ultimately associated with the individual who [he] believe[d] might be a suspect." Defendant objected on the grounds of unnecessary narration. The court noted, "I think there has to be some explanation here . . . there's video footage playing, nothing being asked or answered so that the jury knows to look here, look there." When the person the State alleged was defendant was shown in the video, Sgt. Martinez identified him as "a suspect in the investigation at a later time."

The State then showed the video of the fight and its immediate aftermath, with Sgt. Martinez stating that "people [are] rushing out. There's some type of fight or commotion going up over here in the corner of the establishment, but as he plays the video I see people rushing out . . . [t]rying to get away from the commotion." Sgt. Martinez continued to similarly narrate the fight and the exodus of nightclub patrons immediately after, noting the "[s]uspect and the registered owner of the vehicle which became part of the investigation" were leaving the nightclub.

Next, the jury viewed the very grainy and distant video footage, which Sgt. Martinez testified, showed the suspect "removes what appears to be a

21

handgun from the vehicle and shoots into the crowd." He continued, that the suspect's car "stop[ped], [and it] seem[ed] like they[] [were] looking at the . . . deceased victim." Defendant objected to the remarks about where the individuals in the car were looking "unless it[] [was] specifically on the video, which the jurors c[ould] see for themselves." The court did not strike Sgt. Martinez's testimony but instructed him to "just play the footage and let the jurors see for themselves."

When the video concluded, the State asked Sgt. Martinez if he had decided to investigate the Ford Focus and why, to which he responded: "Because you saw the person — the suspect run to the vehicle, retrieve a handgun, and shoot into a crowd." Sgt. Martinez further testified he was able to locate defendant using information he learned about the Ford Focus, saying he "came across [defendant] fitting the description of the male in the video wearing the same exact hooded sweatshirt . . . and that day we detained him . . . for questioning."

## B.

Defendant argues that Sgt. Martinez's narration of the surveillance video footage was prejudicial because the State's case relied heavily on the footage. There was no eyewitness testimony identifying defendant at the nightclub, no weapon recovered in connection to the shooting, and defendant denied firing a

gun that night in both his interrogation and private text messages. Citing State v. McLean, defendant asserts police officers cannot testify about what they "'believed,' 'thought' or 'suspected,' but instead [must provide] . . . an ordinary fact-based recitation . . . [as] a witness with first-hand knowledge." 205 N.J. 438, 460 (2011). Defendant maintains that Sgt. Martinez "grossly exceeded what he was permitted to say" and "severely undermined the jury's capacity to fairly and independently evaluate the evidence" by stating that defendant was the suspect in the video footage who retrieved a gun from the Ford Focus and shot it into the crowd killing Sims.

Defendant also relies on State v. Watson, which established four limiting principles that video narration testimony cannot: (1) be "continuous" or "running commentary"; (2) "offer opinions about the content"; (3) "offer . . . views on factual issues that are reasonably disputed"; or (4) "comment on what is depicted in a video based on inferences or deductions, including any drawn from other evidence." 254 N.J. 558, 603-04 (2023). However, Watson is not controlling because the ruling occurred after defendant's October 2022 trial as well as the denial of his motion for a new trial on December 6, 2022. The Court held it "applies to this and future cases," and another decision that day. 254 N.J. at 589.

Defendant contends there was credible evidence to show he did not shoot a gun and thus Sgt. Martinez's "repeated assertion" that the video footage showed him doing just that "significantly undermined the jury's capacity to fairly and independently evaluate that evidence." For support, he stresses:

> There was no muzzle flash in the footage purportedly showing [him] as there was with the BMW shooters; ShotSpotter software did not pick up any shots fired in the area where [he] was allegedly located; ballistics suggested the fatal bullet could have been fired from a gun recovered from the BMW; and there were no spent projectiles found matching a gun that would be loaded by 'racking,' as officers said in the interrogation they saw [him] do in the video. Thus, there was substantial reason to believe that, if it was [him] with a gun near the Ford Focus, the gun was never fired.

Defendant acknowledges that he did not object to all of Sgt. Martinez's narration testimony now challenged on appeal but asserts this testimony "should be evaluated for harmless error, rather than the plain-error standard of review." He argues the State and trial court were fully aware of the narration issues and it did not "seem [like] anything would have been handled differently if those specific statements were objected to." Yet, defendant contends that even under the Rule 2:10-2 plain-error standard, the testimony was "clearly capable of producing an unjust result" because it "push[ed] the jury to reach a verdict it

24                                                                    A-1176-22

would not have otherwise" considering the jury's interest in the video footage and "the significant evidence suggesting [defendant] was not the lethal shooter."

C.

N.J.R.E. 701 sets forth two prongs — perception and helpfulness — addressing the admissibility of a lay witness' opinion regarding a photo or video recording. The rule provides:

> If a witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences may be admitted if it:
>
> (a) is rationally based on the witness' perception; and
>
> (b) will assist in understanding the witness' testimony or determining a fact in issue.
>
> [N.J.R.E. 701.]

Under the perception prong, the testimony must be on the witness "actual knowledge, acquired through his or her senses, of the matter to which he or she testifies." State v. Sanchez, 247 N.J. 450, 466 (2021) (quoting State v. LaBrutto, 114 N.J. 187, 197 (1989)). "The witness need not have witnessed the crime or been present when the photograph or video recording was made in order to offer admissible testimony." Id. at 469.

In State v. Allen, our Supreme Court provided guidance applying the perception prong to a law enforcement officer's lay opinion testimony identifying the defendant in a photograph or video:

> In State v. Lazo, we excluded the opinion testimony of a law enforcement officer unacquainted with a defendant who stated that he included a photo of the defendant in a photo array "[b]ecause of his similarities to the suspects that were described by the victim." 209 N.J. 9, 19, (2012) (alteration in original). We held that "[n]either a police officer nor another witness may improperly bolster or vouch for an eyewitness' credibility and thus invade the jury's province." Id. at 24.
>
> In State v. Singh, however, we affirmed the admission of an arresting officer's lay opinion that the sneakers worn by the suspect in surveillance video looked similar to sneakers worn by the defendant at the time of his arrest, given the officer's direct observation of the defendant's sneakers. [245 N.J. 1, 17-18 (2021)]. We held . . . that the officer's reference to the suspect in the video as "the defendant" was improper in light of the dispute about the identity of the suspect, but that the reference was "fleeting" and did not amount to plain error. Ibid.
>
> In [State v.]Sanchez, we reversed the trial court's exclusion of the defendant's parole officer's identification of the defendant in a photograph taken from surveillance video, given the parole officer's many in-person meetings with the defendant and the capacity of her identification testimony to assist the jury. [247 N.J. 450, 469-75 (2021)]. There, the parole officer's identification derived from her personal perception, which enabled her to identify the defendant in the

26

surveillance photograph "more accurately than a jury could." Id. at 474.

. . . .

In [State v.]Higgs, we barred the lay opinion of a law enforcement officer who was not present at a shooting and testified that an object depicted in a surveillance video appeared to be a firearm. [253 N.J. 333, 365-67 (2023)]. Applying N.J.R.E. 701's "perception" prong, we noted that the detective "had no prior interaction or familiarity with either defendant or the firearm in question" and that "[h]is testimony was based entirely on his lay opinion from watching the video." Id. at 365. . . . We reasoned that "[t]he video was in evidence and the jury should have been permitted to view it slowly, frame by frame, to determine for themselves what they saw on screen, without the influence of opinion testimony by an officer who was not there at the time." Id. at 367. . . . We held that the officer's testimony had invaded the jury's province. Id. at 366-67.

[254 N.J. at 544-46 (second, eighth, and tenth alterations in original).]

Under the helpfulness prong, there are several factors a trial court should consider including "the nature, duration, and timing of the witness's contacts with the defendant," Sanchez, 247 N.J. at 470; "whether there are additional witnesses available to identify the defendant at trial," id. at 472 (quoting Lazo, 209 N.J. at 23); and "the quality of the photograph or video recording at issue," id. at 473. "[O]ther considerations may be relevant to the question of whether

lay opinion testimony will assist the jury in a given case" and "no single factor is dispositive." Id. at 473-74.

The Sanchez Court elaborated that "when the witness has had little or no contact with the defendant, it is unlikely that his or her lay opinion testimony will prove helpful." Id. at 471. The Court also cautioned that "law enforcement lay opinion identifying a defendant in a photograph or video recording 'is not to be encouraged, and should be used only if no other adequate identification testimony is available to the prosecution.'" Id. at 472 (quoting United States v. Butcher, 557 F.2d 666, 670 (9th Cir. 1977)). Additionally, "[i]f the photograph or video recording is so clear that the jury is as capable as any witness of determining whether the defendant appears in it, that factor may weigh against . . . [admitting] that lay opinion evidence . . . [as assistance to] the jury." Id. at 473.

### D.

In reviewing Sgt. Martinez's lay witness narration testimony we are persuaded that some of it should not have been allowed as it violated the perception and helpfulness prongs of N.J.R.E. 701, thereby warranting a new trial.

28

The trial court erred in allowing Sgt. Martinez to testify that the video footage capturing the nightclub parking lot—at or during the time of the shooting—showed the suspect "remov[ing] what appear[ed] to be a handgun from the vehicle and shoot[ing] into the crowd." The testimony is inadmissible as it was not "rationally based on the witness' perception" and would not "assist in understanding the witness' testimony or determining a fact in issue." N.J.R.E. 701(a)-(b). Although defendant did not object, the plain error standard applies because it was "clearly capable of producing an unjust result." R. 2:10-2.

Sgt. Martinez's testimony did not derive from "the acquisition of knowledge through the use of [his] sense[s]." Singh, 245 N.J. at 14. While he "need not have witnessed the crime or been present when the photograph or video recording was made," Sanchez, 247 N.J. at 469, his statement that the suspect grabbed a handgun and shot it into a crowd was based on what he "'believed,' 'thought,' or 'suspected,'" — not "an ordinary fact-based recitation by a witness with first-hand knowledge." McLean, 205 N.J. at 460. Sgt. Martinez speculated that the blurry object depicted in the very grainy, distanced video footage was a gun retrieved by the suspect who raised it to "shoot into a crowd." Such testimony is improper lay opinion given that Sgt. Martinez's later identification of defendant as the suspect was an "expression of a belief in

29

defendant's guilt," id. at 463, rather than his actual perception. While the video conceivably shows a man in a dark shirt retrieve an object from a car, quickly walk towards the center of the parking lot, lift the object to eye-level, and retreat to the car, it is not obvious that it reveals a person getting a gun and discharging it into a crowd. Sgt. Martinez's inference exceeds what is reasonably viewable in the video footage and invaded the jury's province by stating what he believed the suspect did.

Sgt. Martinez's testimony is also inadmissible because it was not helpful to the jury. See N.J.R.E. 701(b). As in Higgs, where a police officer's testimony that surveillance footage showed defendant had a firearm in his waistband was ruled inadmissible, Sgt. Martinez similarly deprived the jury from drawing its own inferences—untainted by his opinion testimony. 253 N.J. at 365-66. Sgt. Martinez was not at the nightclub and did not see the suspect's actions. The jury should have been allowed to conduct its own independent analysis of what was depicted in the video. Ibid. Moreover, like in Higgs, the video footage was highly probative of defendant's guilt as it was disputed that defendant had a gun and shot it into the crowd, and there was no forensic evidence substantiating Sgt. Martinez's belief.

A-1176-22

Sgt. Martinez's testimony was clearly capable of producing an unjust result and thus constitutes plain error. The State's case depended on the jury accepting its contention that defendant was in the nightclub parking lot with a gun in hand and shot into the crowd, thereby hitting the victim. The trial record reflects that defendant denies having a gun and firing it. Sgt. Martinez's testimony that the video depicted defendant retrieving a gun and firing into the crowd killing Sims was highly probative and likely to influence the jury's own interpretation of these events.

Similarly, the trial court also erred in allowing Sgt. Martinez to testify that defendant is the suspect in the video footage. Sgt. Martinez testified that he investigated the car identified in the footage as the vehicle of interest—namely, the grey Ford Focus—because the footage showed "the suspect [ran] to the vehicle, retrieve[d] a handgun, and [shot] into a crowd." He stated his investigation revealed the owner was Sade Hill and defendant drove the vehicle. This conclusion was reached, he explained, because police officers "came across [defendant] fitting the description of the male in the video wearing the same exact hooded sweatshirt and . . . that day [they] detained him . . .for questioning." Sgt. Martinez's identification testimony pales in comparison to the officer's permissible testimony in Singh. The officer in Singh identified the defendant

31

based on specific shoes he was wearing during apprehension, and the identification was entered into evidence for the jury to compare to those in the footage. 245 N.J. at 7-11. In contrast, Sgt. Martinez identified defendant based on a black hoodie which was not entered into evidence. Thus, even if Sgt. Martinez's testimony was rationally based on his observation at the time of defendant's apprehension, it was nonetheless unhelpful to the jury as the parking lot video footage was poor quality, the black hoodie is non-descript and was not entered into evidence, and Sgt. Martinez primarily relied upon the black sweatshirt to identify defendant at the crime scene. See Singh, 245 N.J. at 20. This testimony was clearly capable of producing an unjust result given this issue was disputed and the lack of other circumstantial evidence substantiating Sgt. Martinez's testimony.

Finally, defendant's challenge to Sgt. Martinez's testimony that defendant had an argument inside the club resulting in a fight with three other males is without merit. While erroneously admitted, because the jury can see for itself what occurred without narration, the testimony was harmless given that it lacked probative value regarding defendant's guilt.

32

III.

JURY'S VIEWING OF SURVEILLANCE VIDEO FOOTAGE

A.

In Point III, defendant argues plain error occurred when the trial court allowed the jury to view the admitted surveillance video footage during its jury room deliberations on the State's laptop denying him due process and a fair trial.

Prior to its deliberations, the trial court permitted the jury to have the State's laptop, including the video footage and other evidence, without defendant's objection. The court noted there was "no audio" on the footage, as opposed to the video recording of defendant's interrogation, which was not allowed in the jury room based on the court's position that the law requires it to be viewed in open court. The State and defendant both confirmed the laptop did not include anything the jury was not allowed to view. During deliberations, the court, with no objection from the parties, granted the jury's request for a larger monitor to view the video footage.[5]

---

[5] A TV to connect to the laptop was placed in the jury room.

B.

Defendant argues his conviction should be reversed entitling him to a new trial because his constitutional rights to due process and a fair trial were violated as the surveillance video footage should "have been kept out of the jury's hands, as any playback of such footage must be in open court with counsel and in conjunction with a proper limiting instruction." He contends that harmful error was amplified when the trial court "fail[ed] to confirm that the laptop did not have internet access and fail[ed] to give a limiting instruction informing the jurors not to use the computer to access the internet or alter the evidence," violating defendant's right to due process and a fair trial.

In support of his argument, defendant relies on our court's recent decision in State v. Knight, rendered after defendant's trial, where we held "subject to offsetting concerns of undue prejudice—that trial courts in their discretion may grant a jury's requests during deliberations to replay the videos in such modes one or more times, provided that the playbacks occur in open court under the judge's supervision and in the presence of counsel." 477 N.J. Super. 400, 405 (App. Div. 2023). We concluded it was not reversible error to grant a jury's request during deliberations to modify the surveillance evidence by pausing and using slow-motion playback. Ibid. Defendant argues the jury's access to the

video footage failed to adhere to <u>Knight</u> and constitutes "plain error clearly capable of producing an unjust result" even though the trial court did not have the benefit of the <u>Knight</u> ruling and "the failure to follow [its] guidelines is not in and of itself reversible."

Defendant also relies upon several cases prior to <u>Knight</u>, regarding the evolving trial court procedure for jury review of video-recorded evidence. In <u>State v. Michaels</u>, defendant stressed that we noted there must be "caution against routine replaying" of video-taped statements without adequate safeguards. 264 N.J. Super. 579, 644 (App. Div. 1993), <u>aff'd</u>, 136 N.J. 299 (1994). In <u>State v. Burr</u>, defendant pointed out our high Court held that replay of video-taped witness statements for the jury "must occur in open court." 195 N.J. 119, 135 (2008). In <u>State v. Miller</u>, defendant maintains the Court reaffirmed these principles, holding that playback of recorded statements must take place in open court to "avoid[] the selective replaying of only a portion of testimony." 205 N.J. 109, 123 (2011).

Recognizing that the trial court did not have the benefit of the <u>Knight</u> ruling and that defendant did not object to the jury being given the footage or the laptop during deliberations, defendant argues that the jury's access to the footage constitutes "plain error clearly capable of producing an unjust result"

35

even though the trial court did not have the benefit of the Knight ruling. Defendant contends the jury's ability to repeatedly watch the video footage, the State's most significant evidence, and to modify it without any limiting instruction raises "'reasonable doubt' . . . as to whether the error led the jury to a result 'it otherwise might not have reached.'" Knight, 477 N.J. Super. at 424 (internal quotations omitted). Coupled with Sgt. Martinez's improper narration, defendant asserts the lack of limiting instructions for the jury was harm that "sufficiently undermined [his] right to a fair trial such that it amounts to reversible error."

Last, defendant argues it was reversible error to give the jury the laptop because it was contrary to Rule 1:8-8, which provides that the only items to be provided to the jury during deliberations are the exhibits (minus witness statements and video footage) and the jury instructions. Defendant points out that although the laptop was "clean," there was no assurance that the laptop could not connect to the internet. He contends "there is widespread support for the rule that all internet-accessible electronic devices should be banned from deliberations." See, e.g., Dennis M. Sweeney, Worlds Collide: The Digital Native Enters the Jury Box, 1 Reynolds Ct. & Media L.J., 121, 141 (2011) (advocating for ban on "computers, cell phones, or other electronic

communication devices" during deliberations); General Order No. 58: Prohibition of Recording of Court Proceedings; Regulating Possession and Use of Electronic Devices in the Courthouse ¶ 2(c) (N.D. Cal. 2024) ("Jurors may not use electronic devices in courtrooms during judicial proceedings or in jury rooms during, or in connection with, deliberations.").

The State argues that defendant agreed the laptop was "clean," made no objection to the jury using it because there was no audio or witness statements in it, and "repeatedly urged the jury" to watch the footage noting that it did not show defendant near the other shooters nor any muzzle flashes. The State stresses that nothing in the record confirms whether the laptop was able to connect to the internet. The State maintains defendant's reliance on Knight is misplaced because our court made clear the ruling applied prospectively, not retroactively. 477 N.J. Super. at 425.

The State argues that defendant's failure to object and his active encouragement to the jury to review the video footage as argued in summation constitutes invited error precluding reversal of his conviction. The State relies on State v. A.R., where the Court held invited error prevents reversal where the defendant not only "failed to object to the course selected by the trial judge," but "actively encouraged the jury to review the video-recorded statements and

urged the . . . [judge] to submit the video recordings to the jury." 213 N.J. 542, 561 (2013).

The State contends defendant's argument concerning whether the laptop had internet access is "sheer speculation." The State also maintains jurors were instructed not to conduct research on the "internet" or "any electronic medium." It asserts defendant "must establish more than a mere possibility" that jurors who had their cellphones taken away would ignore the court's instructions against internet research with a computer.

C.

Rule 1:8-8 provides that "[t]he jury may take into the jury room the exhibits received in evidence." However, audio- or video-recorded statements have been treated differently, as "a hybrid that is both a demonstrative exhibit and testimony." A.R., 213 N.J. at 560. "[U]nder no circumstances shall the jury have unfettered access to audio- or video-recorded statements in the jury room during deliberations." Id. at 560-61. Replay of such statements must be held in open court. Ibid; see also Michaels, 264 N.J. Super. at 643-44 ("We agree with the line of cases holding that it is error to allow the jury to have videotaped testimony and a means of playing it in the jury room."); State v. McNeil-Thomas, 238 N.J. 256, 269 (2019) (noting that the jury requested to see a video

admitted into evidence and the video was played for the jury in open court) accord Miller, 205 N.J. at 123; Burr, 195 N.J. at 135; Michaels, 264 N.J. Super. at 644.

As an additional safeguard, the Court noted in State v. Weston, that "a replay of a videotaped statement during deliberations should only be conducted upon the jury's request, and after a determination that the jury's concerns cannot be addressed with a readback of testimony."  222 N.J. 277, 293 (2015). Moreover, the Court emphasized that in making these decisions, the trial court must "take into consideration fairness to the defendant."  Id. at 291 (quoting Burr, 195 N.J. at 135).

Yet, unsupervised jury access to admitted video recordings of the witness statements may not always be the basis for reversing a defendant's conviction. The Weston Court held that where a defendant does not object to the jury's unsupervised access to properly admitted witnesses' videotaped statements, reversal of conviction only occurs where the statements were a key part of the State's case because under the plain error rule there was "a reasonable doubt as to whether it led the jury to a result it would otherwise not have reached."  222 N.J. at 294.  The defendant is not entitled to a new trial if the State's independent evidence outweighs the error.  See id. at 279-80.

While in <u>Knight</u> we provided guidance for trial courts to consider when playing back video surveillance footage—in open court—to the jury to mitigate prejudice to the defendant,[6] the decision does not apply here because it was issued after defendant's trial and has no retroactive application. <u>See</u> 477 N.J. Super. at 425.

### D.

Guided by the clear case law governing a jury's review of video recorded statements, we conclude plain error occurred when the court allowed the jury

---

[6] In <u>Knight</u>, we stated: (1) slow motion and pauses can be permitted only where the trial court "reasonably finds those modes of presentation would assist the jurors' understanding of the pertinent events and help them resolve disputed factual issues"; (2) judges may play back video footage more than once "provided that the playbacks occur in open court under the judge's supervision and in the presence of counsel"; and (3) the trial court should consider various factors in determining whether playback is appropriate, including:

> (a) whether the video has a soundtrack that contains recorded statements of the filmed persons; (b) whether the video is difficult to discern when played only at normal speed; (c) whether the video can assist in resolving disputed issues of identification; (d) whether the video bears upon disputed issues of intentionality; (e) whether the video contains content that is particularly disturbing or inflammatory to watch repeatedly in slow motion.
>
> [<u>Knight</u>, 477 N.J. Super. at 405, 425-26.]

unsupervised access to view the night club surveillance video footage during its deliberations. As our Court has repeatedly held, for some time now, trial courts must only replay video-recorded statements in open court and at the jury's request to avoid the potential for undue prejudice to the defendant. See McNeil-Thomas, 238 N.J. at 269; Weston, 222 N.J. at 292-93; A.R., 213 N.J. at 560-61; Miller, 205 N.J. at 123; Burr, 195 N.J. at 135; Michaels, 264 N.J. Super. at 644. The trial court did not appreciate the video footage's susceptibility to manipulation outside of open-court proceedings as our case law has guarded against. See Weston, 222 N.J. at 293; Michaels, 264 N.J. Super. at 644. The judge did not provide a limiting instruction to the jury about playing the video and the jury did not view the footage in open court under the court's supervision to allow the parties the opportunity to express their concerns. Notably, the surveillance footage was a crucial aspect of the State's case due to the lack of forensic evidence linking defendant to the shooting and eyewitness identification of defendant as the person who shot Sims. The video footage served as direct evidence capturing the moments leading up to the shooting and purportedly revealed the shooting itself. Thus, plain error occurred as there is a reasonable doubt that the jury would have reached its guilty verdict without having unfettered access to the video footage. See Weston, 222 N.J. at 294. The

State presented no independent evidence to outweigh the error, and defendant is entitled to a new trial.  See Weston, 222 N.J. at 279.

We, however, see no error in the court's failure to ensure the State's laptop did not have access to the internet.  The court instructed the jurors "you must rely solely upon your understanding and recollection of the evidence that was admitted during the trial"; "[a]ny exhibit that has . . . not been marked  in evidence cannot be given to you in the jury room"; and "during deliberations and, in fact, any time that you're in the jury deliberating room, you must keep any cell phone, pager or other communication device you may possess turned off."  Given that defendant has not proffered any evidence to the contrary, we assume the jurors followed the court's instructions.  See State v. Burns, 192 N.J. 312, 341-43 (2007).

IV.

DEFENDANT'S SENTENCE

Finally, in Point IV and his supplemental brief, defendant asserts that the trial court erred in sentencing him because it did not establish the proper sentencing range for a persistent offender extended term under N.J.S.A. 2C:44-3(a); failed to correctly assess the aggravated and mitigating factors, resulting in an excessive, maximum extended term sentence; and should have had the jury

42

decide whether he qualified as a "persistent offender" as required by <u>Erlinger</u>, 602 U.S. at 833-35.[7]  Given that we have reversed defendant's conviction and remanded for a new trial, we need not address defendant's challenges to his sentence.

We reverse and remand for retrial for the reasons set forth in this opinion. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

---

[7] In <u>State v. Carlton</u>, 480 N.J. Super. 311, 356 (App. Div. 2024), we concluded that the <u>Erlinger</u> framework requires that only "the jury decides . . . if [the] defendant is eligible for a discretionary extended term as a persistent offender." Our Supreme Court granted certification, 260 N.J. 478 (2025), but has not ruled as of the date of this decision.

A-1176-22

_____

SUSSWEIN, J.A.D., concurring.

I agree with the analysis and result in the court's opinion. I write separately to add comments on whether juries should be allowed to view surveillance videos[1] in the jury room. The admission of video surveillance evidence has become commonplace at criminal trials. That trend no doubt will continue and accelerate as more governmental, commercial, and residential video cameras are installed throughout the State. The case law recounted in the court's opinion suggests that as a general principle, video playbacks should only be conducted in the courtroom under the supervision of the judge. In light of the proliferation of video surveillance evidence, it may be time for policymakers to revisit and update the Evidence Rules to account for modern realities. In the meantime, it seems prudent to remind attorneys and judges that there is an alternative option that can be used to supplement replaying the video recording in open court, namely, providing the jurors with screenshot photographs that show the critical details in the video recording that are in dispute.

---

[1] I address only surveillance videos, that is, non-audio recordings taken by exterior and interior cameras installed by law enforcement and other government agencies, businesses, and homeowners, including doorbell cameras. I do not address in this concurring opinion other types of video evidence, such as audio-video recordings of stationhouse interrogations, see R. 3:17, and de benne esse testimony. Those forms of video evidence implicate different concerns and thus raise different issues.

## I.

I firmly believe that properly instructed juries can be trusted to review surveillance video evidence in the jury room for the same reasons that they have long been trusted to review other forms of photographic evidence in that forum. I am not persuaded that jurors should be categorically prohibited from using the commonplace technology of a video player in fulfilling their obligation to carefully—and independently—examine videographic exhibits that have been admitted into evidence.

Accordingly, I believe that trial judges should have discretion to provide a jury with a video playback device so that jurors can study video surveillance evidence at their own pace in the privacy of the jury room. I am satisfied that many of the concerns that have been voiced by some courts, commentators, and social scientists can be addressed on a case-by-case basis and ameliorated by (1)

2

limiting the playback features on the equipment provided to the jury,[2] and (2)

issuing careful jury instructions tailored to the specific situation.[3]

[2] Juries should only be permitted to use a playback device approved by the court. Jurors should not be allowed to use their own devices. The equipment provided to the jury should not be able to access the internet or have any "artificial intelligence" capability. The device should only be capable of playing the specific video recordings(s) that were admitted into evidence and provided to the jury for their review. Further, only playback features (e.g., slow motion, zoom/enlarge, freeze-frame, split screen, superimposing a time stamp not displayed in the original recording, revealing metadata, etc.) that have been specifically approved by the court should be operational; unapproved features should be disabled. See note 8.

[3] I recognize that existing model jury instructions direct the jury to consider video footage with an eye to "all of the evidence" and an awareness of the potential effects of certain alterations to the footage. Model Jury Charges (Criminal), "Playback of Video Footage (Knight Charge)" (Aug. 2025) (requiring the court to inform the jury that a requested exhibit will be replayed with specific alterations including, as applicable, slow motion, pauses, speed changes, or zoom; that "[s]tudies show that watching a video in slow motion can cause viewers to perceive an action as more intentional . . . [or] that the actor had more time to act;" and instructing the jury to "consider all of the evidence presented, and not give undue weight to the video you have seen . . . played back").

The Committee on Model Criminal Jury Charges should consider drafting additional instructions to aid trial courts in explaining the limitations on a jury's use of video playback technology in the jury room. The practical implementation issues and limitations on the use of video playback equipment provided to the jury in criminal cases might also be considered by the Criminal Practice Committee.

The jury instruction safeguard is especially important. I see no reason to discount the presumption that juries will follow instructions. See State v. Loftin, 146 N.J. 295, 390 (1996) ("That the jury will follow the instructions given is presumed."). Nor should we assume that jurors today are not competent to use a video playback device, or that they will misuse the technology to review evidence in a manner that is inappropriate.

As noted, jurors have long been allowed to have exhibits in the jury room. That includes photographs. I see no reason why the well-accepted practice of allowing jurors to study photograph exhibits in the jury room should not be extended to include surveillance video recordings, which are, essentially, a compilation of numerous still frames shown in rapid sequence. Accordingly, once a surveillance video has been admitted into evidence, there should not be a categorical rule precluding jurors from reviewing it in the jury room. But nor should there be a categorical rule requiring courts to equip jury rooms with video players. Rather, trial judges should have discretion in determining what evidence may be taken into the jury room.

Trial courts are, of course, expected to explain the reasons for exercising their discretion. See R. 1:7-4(a); Curtis v. Finneran, 83 N.J. 563, 570 (1980). A court, therefore, ought not rule on a request to provide the jury with video

4

playback equipment without considering the benefits and risks in the specific circumstances of the case. The court should explain the reasons for its decision on the record after affording the parties the opportunity to offer arguments for and against jury-room review of video evidence.

The absence of an objection by a defendant to the proposed use of a playback device is especially significant, not just because that circumstance invokes the plain error standard of appellate review, see R. 2:10-2, but also because it suggests that there is nothing prejudicial in allowing the jury in that case to meticulously examine the video evidence. It bears noting that such careful review may support the defense argument that, contrary to the position advocated by the prosecutor, the video does not establish, for example, that the defendant is the person shown in the recording. Further, a rule permitting video playback in the jury room would apply equally to surveillance video evidence offered by the defense, including, for example, a recording taken from a different angle that undermines the State's interpretation, or video captured by a camera across town purporting to support an alibi.

## II.

The debate over whether juries should be allowed to have video players in the jury room is, in my view, a tempest in a teapot, in part because the risk of

5

misuse of either the playback device or the video evidence itself may be overstated, and in part because the debate often does not acknowledge the significance of the time-honored practice that allows juries to closely—and independently—examine photographic exhibits that have been admitted into evidence.

Surveillance videos often are admitted for the purpose of identifying a specific vehicle or person, or to focus on an object brandished by the subject, such as a suspected firearm. It would seem axiomatic that when a surveillance video is introduced to show one or more specific details captured in the recording (e.g., a depicted person's hairstyle or facial hair, a distinctive logo on the person's clothing, or jewelry), jurors can achieve a better understanding of those details by viewing the evidence as many times as the jurors themselves deem helpful. Consider that when deciding whether a police officer is qualified to offer "narration" lay opinion testimony, courts assess whether the officer had an opportunity to carefully watch the video which they are to describe. See State v. Watson, 254 N.J. 558, 569 (2023) ("As to narration evidence, an investigator who has carefully reviewed a video recording can satisfy the 'perception' prongs under N.J.R.E. 701 and 602 and the 'helpfulness' prong under N.J.R.E. 701 and offer lay witness testimony.") (emphasis added).

A-1176-22

The "careful review" contemplated in <u>Watson</u> may entail replaying the video repeatedly until the witness is comfortable that they have discerned all relevant details that can be gleaned from the recording. Stated another way, an investigator must review a video carefully to become helpful to the jury as a lay opinion witness. Jurors should have the same opportunity to study the evidence carefully and thoroughly. When that is permitted, indeed, facilitated, jurors would be less likely to need help from a narration witness. When that is not permitted, the jury's truth-finding function may be seriously impaired.

Importantly, a practice that hampers the jury's ability to carefully review surveillance video evidence is all the more problematic in light of the Supreme Court's express reliance on juries to do just that with respect to disputed details. See <u>ibid.</u> (explaining that investigators "may not comment on facts that are reasonably in dispute, which should be left for the jury to decide.").[4] That

_____

[4] It bears noting that because an investigator cannot offer testimony in the form of an interpretive opinion on disputed facts in the video, there can be no opportunity for cross-examination or rebuttal testimony. But there is no comparable limitation on the arguments made by the attorneys in their summations to the jury. Presumably, the prosecutor and defense counsel will have studied the video closely on their desktop computer monitors and may refer to details that are not easily discerned by watching the video on a courtroom viewscreen at live-action speed. It is true that juries are instructed that the remarks of counsel are not evidence and that they should rely on their own recollection of the evidence. See <u>Model Jury Charges (Criminal)</u>, "Instructions

important principle presupposes, of course, that the jury is adequately equipped to resolve critical factual disputes concerning the video evidence on its own.[5]

I am especially concerned that when a jury is only allowed to view surveillance video evidence when it is replayed to them in open court, jurors might be chilled from asking the judge to replay the video, or select portions of it, numerous times. As a result, a video replayed in the courtroom may be shown fewer times than if the jurors themselves controlled the playback in the jury room. Nor would jurors have the ability in the courtroom to instruct the judge (or attorney controlling the replay device) to focus on specific segments by asking, for example, to "stop, go back a second and freeze the image." In contrast, the jury would have the ability to control the replay in this manner if they were operating the playback device in the jury room.

---

After Jury Is Sworn" (rev. Sept. 2022) (clarifying that attorneys' summation "is not evidence but [rather the attorneys'] recollection as to the evidence"). Even so, the practice of allowing only counsel to highlight those details, rather than witnesses subject to cross-examination and rebuttal testimony, heightens the need to afford juries the best possible opportunity to closely study the relevant portion(s) of the video after closing arguments. Without that opportunity to scrutinize videographic evidence, jurors may not be able to verify or dispel an advocate's description of a pertinent detail.

[5] At the risk of stating the obvious, the question, for example, of whether the defendant is the person depicted in the video is likely to be a hotly disputed fact in a prosecution where it is undisputed that a crime was committed and the key issue is who committed it.

A-1176-22

I recognize that some would argue that such control by the jury is a bad thing. I strongly disagree. Our system of justice is well served when jurors meticulously study the evidence, focusing their attention on what they think is important to their truth-finding role. Stated another way, repetition in examining photographic or videographic evidence is not something to be discouraged, much less precluded. Relatedly, it is well within the province of the jury to decide how much emphasis, and ultimately weight, to give to a piece of evidence, provided that they are instructed that they must consider all of the evidence and not just one exhibit or portion thereof. Cf. State v. Muhammad, 182 N.J. 551, 577 (2005) ("Jurors 'may reject what in their conscientious judgment ought to be rejected and accept that which they believe to be credible.'") (citation omitted). See also State v. Miller, 205 N.J. 109, 121 (2011) ("We trust juries with the critically important task of determining facts and making credibility assessments to reach a fair verdict."); Model Jury Charges (Criminal), "Video Narration Testimony" (Aug. 2025) ("Ultimately it is up to you, and you alone, to decide for yourselves what the video shows and what it does not show. It is also up to you to determine how much weight to give the video evidence.").

A-1176-22

In my view, this issue boils down to whether we can trust juries that have been properly instructed on how to consider the various forms of evidence that have been presented to them, including video evidence. It seems self-evident that jurors should be permitted in their deliberations to drill down on the specific evidence that they deem to be most important. In the specific context of a surveillance video, jurors may thus choose to focus their attention on a short snippet—or even a single frame—by which they divine a clear signal from visual background noise. The process of separating the wheat from the chaff in a surveillance video recording is a quintessential jury function. Accordingly, it is the jurors' prerogative to watch that snippet over and over until they are fully comfortable with their conclusions about it.

There is another drawback to categorically requiring that any replay of surveillance video be done in the courtroom rather than the jury room. It bears emphasis that jurors cannot comment on a video as it is being played in open court and thus cannot argue amongst themselves over the significance of the images while the video is playing. Rather, that conversation—which could be of critical importance to the deliberative process, especially when the case hinges on the identity of the pictured culprit—must wait until they have returned to the jury room. That means their discussion of the import of the video will

10

depend on their recollections of what was played or replayed to them in the courtroom, rather than their present impressions of the relevant images as would occur if those images were able to be viewed while the jurors are debating them.

I appreciate that our system of justice relies on jurors' individual recollections of what transpired in the courtroom. But there is a reason why some exhibits are taken into the jury room under longstanding trial practice—to allow them to study the evidence while deliberating on it. I am persuaded that surveillance video falls into this category.

I am likewise convinced that jurors can see and comprehend fine details captured in a recording better when the video is played in slow motion rather than at live-action speed, regardless of how many times it is replayed. Cf. State v. Knight, 259 N.J. 407, 412 (2024), reconsideration denied, 260 N.J. 16 (2025) (noting that "[w]atching a video in slow motion is a commonplace method of playing a video that is not beyond the ken of an average juror" and "playing in slow motion the same video that was properly admitted into evidence to highlight the action occurring onscreen . . . is generally no different from allowing the jury in Boland[ v. Dolan, 140 N.J. 174 (1995)] to use a magnifying glass to meticulously inspect a picture."). Anyone who has watched an NFL broadcast can attest that zoom-in and slow-motion features used on instant

11

replay can enhance a viewer's ability to focus on and comprehend the specific pixels that reveal what happened on the playing field.

## III.

Accepting that under prevailing law, video playbacks generally should be done in the courtroom under the supervision of the judge, I take this opportunity to remind lawyers and judges of what could be characterized as a "lateral thinking" option to be used in appropriate cases in addition to replaying the video in open court. Many of the concerns with allowing jurors to play video recordings in the jury room can effectively be circumnavigated if jurors were provided with carefully selected[6] "screenshots"—still-frame photographs taken from the video recording that was played at trial.

---

[6] The party offering the video evidence should propose which "screenshot" frame(s) from the video recording should be marked as exhibits. The trial court, after hearing the arguments of the attorneys in limine, would then decide which still photographs should be admitted into evidence, applying the same rules as would govern the admissibility of any other proposed photographic exhibits.

I would add that this still-frame selection procedure could be done when a party first proposes to introduce a video into evidence. The process of selecting and admitting pertinent screenshot exhibits need not wait until the jury asks for a replay during its deliberations. Indeed, providing such still photographs to the jury when the video is first played might obviate the need for the jury to ask for a replay.

A-1176-22

When surveillance video evidence is admitted to identify a person, vehicle, or object depicted on-screen, depending on the circumstances, there may be little or no added benefit to jurors by viewing a "motion" picture in the jury room.[7]  Rather, a freeze-frame screenshot may afford an even better opportunity for the jurors to meticulously scrutinize the image.  And in cases where the video is offered to show how much time elapsed between events, two "time-stamped" screenshots admitted into evidence can provide jurors with objective proof, free from the potential distorting effects of the slow-motion playback of a video recording.  See Eugene M. Caruso et al., Slow Motion Increases Perceived Intent, 113 Proc. Nat'l Acad. Scis. 9250 (2016).[8]

---

[7]  I recognize that a video may be relevant to show action, such as perpetrators or victims fleeing from a crime scene.  There also may be cases where surveillance video is used to identify a suspect by their distinctive gait.  In cases where animation is relevant, a "motion picture" is needed to present a true representation of the electronically recorded events.  I would add, however, that in those circumstances, the slow-motion and freeze-frame features of a video player might not be particularly helpful, and indeed, might inhibit the viewer from understanding, for example, the speed of a person leaving the scene, or from recognizing the subject's distinctive movements (e.g., a limp) that might help to identify them.

[8]  In any case where there is a risk that slow-motion replay might mislead the jury with respect to whether and to what degree the defendant acted with deliberation (i.e., purposely), the trial court could address that concern with a specific jury instruction explaining that risk, see note 3 and accompanying text, just as jurors are instructed on the risks associated with eyewitness

The point is simply that there will be occasions when still images extracted from a video recording would assist jurors in understanding the significance of what was captured by a surveillance camera. That is where the long-accepted practice of "publishing" a still photograph to the jury comes to the fore.

It can hardly be disputed that trial courts have discretion to admit into evidence still photographs that are relevant and properly authenticated. <u>See</u> <u>State v. Thompson</u>, 59 N.J. 396, 420 (1971) ("It has long been the rule in this State that admissibility of photographs . . . rests in the discretion of the trial court") (collecting cases); <u>see</u> <u>also</u> <u>Brenman v. Demello</u>, 191 N.J. 18, 30 (2007) (explaining that photographs are admissible if they are relevant, their probative value is not outweighed by the risk of undue prejudice, and they are properly authenticated as a substantially accurate representation of what they depict). I suspect that photographs have been introduced as trial exhibits for nearly as long as photography has been around.

---

identifications. <u>See</u> <u>State v. Henderson</u>, 208 N.J. 208, 289, 303 (2011). Alternatively, the judge could instruct the jury not to use the slow-motion feature or direct that this feature of the video player be disabled before the device is provided to the jury. <u>See</u> note 2.

14

Importantly, it is also well-established that a photographic exhibit can be published to the jury, meaning not only that it will be passed among the jurors while they sit in the jury box, but also may be provided to them, along with other writings and documentary evidence, to review in the jury room at their own pace. See R. 1:8-8(a) ("The jury may take into the jury room the exhibits received in evidence"). This time-honored practice affords jurors the ability to painstakingly scrutinize an exhibit and engage in a vigorous debate over its meaning and relative importance in the privacy of the jury room. See Boland, 140 N.J. at 182 (holding that "[t]he use of a magnifying glass by jurors for exhibits properly introduced at trial is within the trial court's discretion" and citing out-of-State authority for the proposition that a "jury's use of [a] magnifying glass to examine photographs was 'the mere taking of a more critical examination of an exhibit,' not [an] introduction of new evidence") (internal citation omitted).

Because the trial court ultimately decides what photographs are admitted into evidence and which of those exhibits will be published to the jury, the court can maintain appropriate control over how surveillance video evidence is used by the jury without chilling jurors from taking as much time as they want to study and debate the significance of the screenshot exhibit(s), and without

15

revealing the specific focus of the jury's discussions or otherwise intruding on their secret deliberations. Stated another way, admitting and publishing still-frame photographs extracted from video recordings can facilitate the truth-finding process while preserving the integrity and sanctity of jury deliberations.

In sum, providing jurors with carefully selected screenshots could in some cases render academic many of the objections that have been raised to providing video players to juries. This option should therefore be considered in any case where the jury asks for a replay, indeed, in any case where a party introduces video surveillance for the purposes of showing a relevant detail that might be highlighted by one or more screenshot exhibits.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

16                                                                      A-1176-22